## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EUGENE PANECCASIO, | ) |
| | ) Civil Action No. 3:01 CV 2065 (CFD) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNISOURCE WORLDWIDE, INC., | ) |
| GEORGIA-PACIFIC CORPORATION, | ) |
| ALCO STANDARD CORPORATION, and | ) |
| IKON OFFICE SOLUTIONS, INC., | ) |
| | ) |
| Defendants. | ) October 29, 2004 |

## UNISOURCE DEFENDANTS' MEMORANDUM
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

In February 1994, defendant Unisource Worldwide, Inc. ("Unisource"), at the time a wholly owned subsidiary of Alco Standard Corporation ("Alco Standard"), offered a generous early retirement package to certain of its employees, including plaintiff Eugene Paneccasio ("Paneccasio"). Paneccasio accepted the offer, and retired effective April 1, 1994 at the age of 58. The early retirement package contained a number of benefits not otherwise available to Paneccasio, including, among other things, a $7,500 cash bonus; full vesting in the company's retirement plan; continued medical coverage until age 65; and term life insurance paid for by Unisource.

An additional benefit afforded to Paneccasio by virtue of his early retirement was the opportunity to continue to participate in a deferred compensation plan initiated by Alco Standard in 1991 (the "1991 Plan" or the "Plan"). Absent the early retirement program, Paneccasio would have been compelled to receive his deferrals back in a lump-sum distribution, without interest, at

the time of his departure from employment.  The program allowed him to remain a participant, subject to the terms and conditions of the Plan.

Some three years after Paneccasio left employment at Unisource, on January 1, 1997, the company was spun off by Alco Standard, which nonetheless retained control over the 1991 Plan. Unisource became an independent company, and Alco Standard changed its name to IKON Office Solutions, Inc. ("IKON").  Some two years after that, in July 1999, Unisource was acquired by Georgia-Pacific Corporation ("Georgia-Pacific") (Unisource and Georgia-Pacific referred to collectively as the "Unisource Defendants"), but retained its separate corporate identity.  And some eighteen months later, in December 2000, IKON terminated the 1991 Plan.  In accordance with the Plan's provisions, IKON paid all of its participants – including Paneccasio – a defined termination benefit.

IKON's termination of the Plan was incontestably legal, as were its distributions to Plan participants.  Paneccasio nonetheless sued not only IKON, the entity that terminated the Plan, but also the Unisource Defendants.  He claims that all of these defendants' actions violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.,  and constituted age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.  Moreover, Paneccasio contends that he is entitled to bring his age discrimination claim, notwithstanding the facts that his employment with Unisource indisputably terminated in 1994 and that he failed to file an age discrimination claim until more than seven years later, because the defendants allegedly concealed the pertinent facts from him.

As a matter of law, and given the undisputed facts in this case, these claims cannot be sustained.  Paneccasio has offered no basis for a conclusion that any of the defendants' actions breached their obligations to him or, as a result, violated ERISA.  This is especially true for the

Unisource Defendants, who incontestably neither controlled nor terminated the 1991 Plan and who were not responsible for calculating Plan termination benefits paid to former participants. Paneccasio's age discrimination claim, which essentially stems from the same predicate factual allegations, similarly fails. Not only did the Unisource Defendants not violate any promises or inducements made to him, but there is absolutely no evidence that he was treated differently from any other employee. Indeed, all Plan participants, regardless of their ages, were treated exactly alike when the Plan terminated. As important, there is no evidence that the Unisource Defendants knew, or concealed from Paneccasio, any information concerning the 1991 Plan or its potential termination some seven years after his retirement.

Paneccasio withstood the various defendants' motions to dismiss in this case only by promising that he would discover proof of hidden connections among the corporate entities and of conspiracies to conceal allegedly discriminatory schemes. Through more than two years of discovery, however, no such evidence emerged, and in the end, Paneccasio's legal claims collapse under their own weight. Paneccasio has no legitimate claim against the Unisource Defendants under either ERISA or the ADEA, and this Court should grant summary judgment to the Unisource Defendants as to both of these claims.

## FACTUAL BACKGROUND

I.   **Paneccasio Signed Up To Participate In The 1991 Plan After Being Fully Advised As To Its Provisions And The Possibility That It Could Legally Be Terminated.**

Paneccasio began his employment with Unisource, then called Rourke Eno, in 1971, and by 1994 was a vice president of sales and national accounts at the company. (Paneccasio Dep. at

9, Ex. A to Rule 56(a)(1) Statement.)[1]  At that time, Unisource was a wholly owned subsidiary of

Alco Standard Corporation, which later changed its name to IKON Office Solutions, Inc.[2]  (Hope

Dep. at 16, Ex. B to Rule 56(a)(1) Statement.[3])

In or about November 1990, Paneccasio elected to participate in a deferred compensation

plan offered to employees of Alco Standard and certain of its subsidiaries, including Unisource,

and effective commencing January 1, 1991.  (See Paneccasio Dep. at 25, 31-32, Ex. A to Rule

56(a)(1) Statement.)  The Plan was offered only to certain "highly compensated" employees of

Alco Standard and its subsidiaries who met a qualifying income threshold of $100,000.  (Alco

Standard Corporation 1991 Deferred Compensation Plan and Prospectus ("Plan and Prospectus"),

attached as Exhibit C to Rule 56(a)(1) Statement, at 1.)  It permitted these highly compensated

employees to defer a portion of their income until retirement, and additionally to purchase life

insurance pursuant to a "split-dollar" arrangement with Alco Standard.  (Id. at 2-3.)

The Plan and Prospectus, provided to prospective participants including Paneccasio (see

Paneccasio Dep. at 35-36, Ex. A to Rule 56(a)(1) Statement), clearly explained how the Plan was

to operate.  Two provisions are especially relevant here.  First, the Plan provided that employees

whose employment terminated prior to "vesting," which ordinarily occurred after ten calendar

years of service beginning with the effective date of the Plan, would not be entitled to remain in

---

[1] Relevant portions of the August 26, 2003 Deposition of Eugene Paneccasio ("Paneccasio Dep.") are attached as Exhibit A to the Unisource Defendants' Rule 56(a)(1) Statement of Undisputed Material Facts ("Rule 56(a)(1) Statement").

[2] A timeline of relevant events is attached hereto as Exhibit 1.

[3] Relevant portions of the July 6, 2004 Deposition of Walter J. Hope, Jr. ("Hope Dep.") are attached as Exhibit B to Rule 56(a)(1) Statement.

the Plan.  Instead, they would receive the amount of their deferrals, without interest.  (See id. at

11.)

Second, the Plan contained a provision explicitly permitting its termination at the sole

discretion of Alco Standard's Board of Directors.  In the case of termination, participants would

receive distributions based not on whether they were "vested" (had completed ten calendar years

of service from January 1, 1991), but on whether they had begun to receive benefits at the time:

> 19.    Termination.  The Board of Directors of Alco shall have the right to
> terminate the Plan in its entirety and not in part at any time it determines that
> proposed or pending tax changes or other events cause, or are likely in the future to
> cause, the Plan to have an adverse financial impact upon Alco.  In such event, Alco
> shall have no liability or obligation under the Plan or the Participant's Participation
> Agreement (or any other document), provided that 1) Alco distributes, in lump sum
> to any Participant whose benefit payments have not commenced, the value of the
> amount of the Participant's deferrals to the date of termination plus interest
> (compounded annually) at a rate of 6% per annum; and 2) Alco distributes, in a
> lump sum, to any Participant whose benefit payments have commenced, all
> amounts thereafter due . . . .  Such lump-sum distribution, at Alco's election, may be
> made in the form of cash, or life insurance, or both.

(See id. at 14) (emphasis added).

## II.    Paneccasio Took Early Retirement in April 1994, Thereby Obtaining Numerous Financial Benefits Not Otherwise Available To Him.

In 1994, Unisource extended an offer of early retirement to certain of its employees,

including Paneccasio.  (Paneccasio Dep. at 49, Ex. A to Rule 56(a)(1) Statement.)  The early

retirement program had a number of significant financial components, including (1) a one-time

cash bonus of up to $7500; (2) full vesting in the company's retirement plan; (3) continued

medical coverage until age 65; and (4) term life insurance paid for by Unisource.  (See brochure

titled "Your Personal Early Retirement Package" ("Retirement Package"), attached as Exhibit D to

Rule 56(a)(1) Statement.)  Additionally, participants in the early retirement program were offered

the opportunity to become "vested," as that term was defined in the 1991 Plan, and to leave their

contributions in the Plan which they would otherwise have had to remove by virtue of the

cessation of their employment.  (See Retirement Package at 2, Ex. D to Rule 56(a)(1) Statement;

Plan and Prospectus at 2, 10-11, Ex. C to Rule 56(a)(1) Statement.)

W.J. Hope, an IKON employee who subsequently became the Plan Administrator for the

1991 Plan, testified that this type of "vesting," to prevent an immediate lump-sum distribution of

deferrals, was not uncommon:

> It is possible, and it has [been done] in various agreements, for an agreement to
> give, quote, vesting, closed quote, and thereby protect one from an immediate
> payout and preserve whatever rights they might otherwise have under the plan.

(Hope Dep. at 78, Ex. B to Rule 56(a)(1) Statement.)  Paneccasio understood that, absent this

"vesting," he would have received his contributions without interest when he took early retirement.

(Paneccasio Dep. at 86-7, Ex. A to Rule 56(a)(1) Statement; see also Plan and Prospectus at 14,

Ex. C to Rule 56(a)(1) Statement.)

The Retirement Package clearly specified that the provisions of the 1991 Plan would

continue in full force and effect, and that they would govern over any representations in the

Retirement Package brochure:

> [T]he benefits described in this brochure are only summaries of the Early
> Retirement window's major provisions.  More detailed information is available
> from the plan documents and insurance contracts.  In case of any dispute, the
> official legal documents or contracts will govern over this brochure.

 (See Retirement Package at 12, Ex. D to Rule 56(a)(1) Statement; see also Paneccasio Dep. at 60-

61, Ex. A to Rule 56(a)(1) Statement.)

Paneccasio elected to take the early retirement option and retired in approximately April

1994.  (See Paneccasio Dep. at 50, 62, Ex. A to Rule 56(a)(1) Statement.)  Years later, as of

January 1, 1997, Alco Standard – which at the same time changed its name to IKON – spun off

Unisource into an independent entity.  (See Hope Dep. at 14-16, Ex. B to Rule 56(a)(1) Statement;

see also Special Report to Shareholders, attached as Ex. E to Rule 56(a)(1) Statement.)  Georgia-Pacific acquired Unisource in July 1999, with Unisource continuing to retain its separate corporate identity.  See Affidavit of Gary Melampy at ¶¶ 4-5 ("Melampy Aff."), attached as Exhibit F to Rule 56(a)(1) Statement.)  In the meantime, after it spun off Unisource, IKON retained full control over the administration of the 1991 Plan. (See Hope Dep. at 18-22, Ex. B to Rule 56(a)(1) Statement.)

### III. IKON Terminated The 1991 Plan Pursuant To Its Explicit Provisions And Made Distributions As Required Under The Plan, Including To Paneccasio.

In 2000, the IKON Board of Directors decided to terminate the Plan, pursuant to its conclusion that "tax law changes or other events [have] cause[d], or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco."  (Plan and Prospectus at 14, Ex. C to Rule 56(a)(1) Statement.)  The decision to terminate was made exclusively by the IKON Board of Directors, with input limited to a few other employees of IKON.  (Hope Dep. at 43-50, Ex. B to Rule 56(a)(1) Statement.)  Through W.J. Hope, the Plan Administrator, IKON notified Plan participants including Paneccasio of the pending termination, which was to be effective as of December 31, 2000.  (Undated Termination Letter, attached as Exhibit G to Rule 56(a)(1) Statement; Paneccasio Dep. at 76-77, Ex. A to Rule 56(a)(1) Statement.)

Upon termination, the Plan provided for all participants (whether "vested" or not) whose benefit payments had not yet commenced to receive their deferrals plus 6 percent interest.  (Plan and Prospectus at 14, Ex. C to Rule 56(a)(1) Statement.)  Paneccasio, whose benefit payments had not commenced, accordingly was issued a lump-sum distribution comprising his deferrals plus 6 percent interest.  (Paneccasio Dep. at 91-2, Ex. A to Rule 56(a)(1) Statement.)[4]

---

[4] Some 25 other former Plan participants were "vested" at the time of termination pursuant to separation or early retirement agreements, but all similarly received in a lump-sum distribution

Neither Unisource nor Georgia-Pacific, which had in the meantime acquired Unisource, had any involvement in the November 2000 decision to terminate the 1991 Plan or in the calculation of payments due to Plan participants.  (See Melampy Aff. at ¶ 9, Ex. F to Rule 56(a)(1) Statement.)  Indeed, the Plan documents did not on their face afford any role in this decision to either of the Unisource Defendants, and in fact no agent of Unisource or Georgia-Pacific participated in the decision.  (Id.; see also June 23, 2000 Letter from Gary Melampy to W.J. Hope, attached as Exhibit J to Rule 56(a)(1) Statement.)  Hope, the Plan Administrator, met with some employees of Georgia-Pacific concerning the pending termination only after the decision to terminate had been made, and pursuant to a notice requirement that stemmed from Alco Standard's spinoff of Unisource.  (Hope Dep. at 53, 62, Ex. B to Rule 56(a)(1) Statement.)

Paneccasio promised in his opposition to a motion to dismiss filed by the Unisource Defendants that he could and would demonstrate the Unisource Defendants' "relationship" with IKON and facts by which either Unisource or Georgia-Pacific could be held liable under either an age discrimination or an ERISA theory.  (See Pl.'s Mem. in Supp. of Obj. to Mot. to Dismiss at 2.)  Importantly, no such evidence of a nexus between these corporations emerged during more than two years of discovery in this case.  It is clear and undisputed that:

- When Paneccasio signed up to participate in the 1991 Plan, it was through Alco Standard (later IKON).  Georgia-Pacific had no part whatsoever in that transaction.

- When Paneccasio took early retirement and left his employment at Unisource, Georgia-Pacific had no corporate affiliation, of any kind, with Unisource.

---

of their deferrals plus 6 percent interest.  (See Hope Dep. at 122-23, Ex. B to Rule 56(a)(1) Statement; see also January 3, 2001 E-mail from Woody Hope to Carol McGowan, attached as Exhibit H to Rule 56(a)(1) Statement; June 21, 2000 Letter from W.J. Hope to Gary Melampy, attached as Exhibit I to Rule 56(a)(1) Statement.)

- When IKON terminated the 1991 Plan, IKON had no corporate affiliation, of any kind, with either Unisource or Georgia-Pacific.

## ARGUMENT

### I.    **Legal Standard.**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law." Russell v. Eldridge, 832 F. Supp. 535, 537 (D. Conn. 1993)(citation omitted); see also Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993). Summary judgment is not a disfavored procedural shortcut, but is rather "an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted). It is a tool designed to "winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 355 (2d Cir. 1993). "Properly used, summary judgment permits a court to streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986).

A plaintiff may not defeat summary judgment by resting on "mere allegations or denials," see St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir. 2000), but must set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e). Thus, a plaintiff cannot defeat a

motion for summary judgment by "offering purely conclusory allegations of discrimination, absent any concrete particulars. . . ."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); see also Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999) (holding that "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment").  If the evidence presented by the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation and internal quotations omitted).  Mere conjecture or speculation will not create a genuine issue of material fact.  Manessis v. N.Y. City Dep't of Transp., No. 02 Civ. 359, 2003 U.S. Dist. Lexis 1921, at *9 (S.D.N.Y. Feb. 10, 2003) (citation omitted), aff'd, 86 Fed. Appx. 464 (2d Cir. 2004).[5]

## II.    The Unisource Defendants Are Entitled To Summary Judgment On Paneccasio's Claims Under ERISA.

Paneccasio is vague as to the nature of his purported ERISA cause of action against the Unisource Defendants, and has never specified under which provision of ERISA it purportedly arises.  However, the facts of this case do not support an action against the Unisource Defendants under any relevant provision of ERISA, and they are entitled to summary judgment as a result.

### A.    ERISA's Civil Enforcement Provision is Exclusive.

Section 502(a) of ERISA, the civil enforcement provision, sets forth with great precision and detail the types of actions that are permissible, and places express limits on the potential plaintiffs who have standing to bring such claims.  The Supreme Court repeatedly has cautioned courts against expanding in any way these carefully delineated statutory provisions, stating that "Congress did not intend to authorize other remedies that it simply forgot to incorporate

---

[5] Copies of unreported cases are attached hereto as Exhibit 2.

expressly." <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 254 (1993) (emphasis in original) (<u>quoting</u> <u>Mass. Mut. Life Ins. Co. v. Russell</u>, 473 U.S. 134, 146-47 (1985); <u>see also</u> <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41, 54 (1987) (stating that "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive").

Indeed, courts continue to emphasize their belief that "ERISA's express remedies, as the product of long and careful study and compromise, should remain exclusive." <u>Gerosa v. Savasta</u>, 329 F.3d 317, 322 (2d Cir. 2003) (<u>citing</u> <u>Rush Prudential HMO, Inc. v. Moran</u>, 536 U.S. 355, 375-76 (2002); <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 209 (2002). The Second Circuit has concluded that there is "little room in this framework for judicially-created, 'interstitial' remedies." <u>Gerosa</u>, 329 F.3d at 322. Thus, if a plaintiff cannot sue under one of the provisions of § 502(a), he has no remedy under ERISA. <u>In re Enron Corp. Sec.</u>, 284 F. Supp. 2d 511, 603-12 (S.D. Tex.. 2003).

**B.**    **<u>The Unisource Defendants Are Not Proper Defendants Under § 502(a)(1) of ERISA</u>.**

Conceivably, Paneccasio may be seeking to proceed under § 502(a)(1) of ERISA, 29 U.S.C. § 1132(a)(1), which provides a cause of action for a participant in an ERISA-governed plan "to recover benefits due . . . under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." <u>Id</u>.

Actions under this section, however, are expressly limited to administrators or trustees of ERISA plans. They are not permitted against employers who did not have any role in administering the plan in question nor any control over it. It is well settled that "In a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as

such may be held liable." Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1199 (2d Cir. 1989); see also Crocco v. Xerox Corp., 137 F.3d 105, 107-08 (2d Cir. 1998) (same).

In this case, it is undisputed that neither of the Unisource Defendants acted as administrator of the 1991 Plan or had any control over it. (See Melampy Aff. at ¶ 9, Ex. F to Rule 56(a)(1) Statement; see also June 23, 2000 Letter from Gary Melampy to W.J. Hope, Ex. J to Rule 56(a)(1) Statement.) Accordingly, Paneccasio has no standing to pursue a claim under § 502(a)(1) as against either of the Unisource Defendants.

**C.     The Unisource Defendants Are Not Proper Defendants Under § 502(a)(2) of ERISA.**

Paneccasio also might be seeking to vindicate his purported rights under § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), which allows an action by a plan participant, on behalf of an ERISA plan, for an alleged breach of fiduciary duty. Initially, it is clear that Paneccasio has not brought this action on behalf of the 1991 Plan, but on his own behalf. Such individual actions are clearly proscribed under § 502(a)(2). Under ERISA, a plan participant may bring a claim under § 502(a)(2) only on behalf of the plan itself. The statute, and the cases interpreting it, flatly preclude individual suits for damages. See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 (1985) (holding that it was "abundantly clear" that § 502(a)(2) addressed "remedies that would protect the entire plan, rather than . . . the rights of an individual beneficiary"); see also Farrell v. Auto. Club of Mich., 870 F.2d 1129, 1133 (6th Cir. 1989) (noting that § 502(a)(2) "authorizes relief only to the plan itself, not to individual beneficiaries").

Moreover, it is undisputed that this case does not involve allegations of fiduciary breach. First, the dispute in this case involves the termination of the 1991 Plan. Under well-established law, the decision to terminate an ERISA plan is not a fiduciary act, but a "settlor" function to which fiduciary liability cannot attach. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 433-

44 (1999); Lockheed Corp. v. Spink, 517 U.S. 882, 890-91 (1996); Suozzo v. Bergreen, 2002 U.S. Dist. LEXIS 11726 at **34-36 (S.D.N.Y. June 27, 2002).  Indeed, the United States Supreme Court has made clear that a plan administrator can terminate a plan at any time under ERISA without implicating fiduciary liability.  Lockheed Corp., 517 U.S. at 890-91.

Second, even if the termination of an ERISA plan was a fiduciary act, this particular 1991 Plan was not subject to general ERISA fiduciary requirements.  Under its plain terms, the 1991 Plan was a "Top Hat" plan, defined under ERISA as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees."  29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).  It is well settled that Top Hat plans are excluded from ERISA's fiduciary responsibility obligations, because "Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations."  Campbell v. Computer Task Group, Inc., No. 00 Civ. 9543 (RWS), 2001 WL 815575, at *3 (S.D.N.Y. July 19, 2001) (dismissing breach of fiduciary duty claim against Top Hat plan); see also Pereia v. Cogan, 200 F. Supp. 2d 367, 371, 375 (S.D.N.Y. 2002) (noting that Top Hat plans are "governed by contract law as opposed to trust or fiduciary principles under ERISA").

By its express terms, which track the Top Hat definitions set forth in ERISA, the 1991 Plan qualified as a Top Hat plan.  Accordingly, any claim based on an alleged breach of fiduciary duty must fail because the 1991 Plan did not impose such duties.

Finally, even if the 1991 Plan was not a Top Hat plan, which as set forth above it clearly and incontrovertibly was, the Unisource Defendants cannot be held liable under § 502(a)(2) where they were not fiduciaries of the 1991 Plan and accordingly had no fiduciary duties.  The Unisource Defendants had no connection with the 1991 Plan other than to employ some of the participants in

that Plan.  They cannot be charged with a duty in connection with the Plan, and any such cause of

action against them must be dismissed.

**D.**    **The Unisource Defendants Are Not Proper Defendants Under § 502(a)(3) of ERISA.**

Given that §§ 502(a)(1) and (2) clearly do not provide him with a right of action against the

Unisource Defendants, the only other potential source of such a private right of action for

Paneccasio would be under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).  That provision permits

an action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which

violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate

equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the

terms of the plan."  29 U.S.C. § 1132(a)(3).

However, Paneccasio is not seeking equitable relief in this case.  He is seeking money

damages – the additional benefits he claims to have been entitled to by virtue of his participation in

the 1991 Plan.  (See Compl. at 24.)  Under United States Supreme Court precedent, this claim is

not tenable under Section 502(a)(3).  Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S.

204 (2002).[6]

In Great-West, the Supreme Court categorically rejected the argument that § 502(a)(3),

which is limited on its face to equitable relief, encompasses the type of action that Paneccasio has

brought, in which he claims that the Unisource Defendants' alleged, unspecified fiduciary and

non-fiduciary breach entitles him to compensation.  Although the petitioners in Great-West had

---

[6] Great-West overruled an earlier Second Circuit decision that had held that restitution under § 502(a)(3) could include the kind of "make-whole" relief arguably sought by Paneccasio.  See Strom v. Goldman, Sachs & Co., 202 F.3d 138 (1999).  Although the Second Circuit has not had occasion to reconsider its holding in Strom, numerous courts have confirmed that Justice Scalia's opinion in Great-West directly rejected its reasoning and its result.  See, e.g., In re Enron Corp. Sec., 284 F. Supp. 2d 511, 603-12 (S.D. Tex.. 2003) (citing cases).

characterized their suit as one seeking restitution and therefore equitable, the Supreme Court was

unpersuaded.  In a lengthy discussion, the Court explained why a suit that, like this one, seeks to

recover monetary damages for an alleged breach of duty is not equitable and cannot proceed under

section 502(a)(3):

> Thus, "restitution is a legal remedy when ordered in a case at law and an equitable
> remedy . . . when ordered in an equity case," and whether it is legal or equitable
> depends on "the basis for [the plaintiff's] claim" and the nature of the underlying
> remedies sought.  Reich v. Continental Casualty Co., 33 F.3d 754, 756 (7th Cir.
> 1994) (Posner, J.).
>
> In cases in which the plaintiff could not assert title or right to possession of
> particular property, but in which nevertheless he might be able to show just grounds
> for recovering money to pay for some benefit the defendant had received from him,
> the plaintiff had a right to restitution *at law* . . . . In such cases, the plaintiff's claim
> was considered legal because he sought "to obtain a judgment imposing a merely
> personal liability upon the defendant to pay a sum of money."  Restatement of
> Restitution § 160, Comment a, pp. 641-642 (1936).  Such claims were viewed
> essentially as actions at law for breach of contract (whether the contract was actual
> or implied).
>
> In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a
> constructive trust or an equitable lien, where money or property identified as
> belonging in good conscience to the plaintiff could clearly be traced to particular
> funds or property in the defendant's possession. . . . Thus, for restitution to lie in
> equity, the action generally must seek not to impose personal liability on the
> defendant, but to restore to the plaintiff particular funds or property in the
> defendant's possession.

Id. at 213-14 (emphasis in original) (citations and internal quotations omitted).  Accordingly, the

Court concluded, where the basis for the claim is "not that respondents hold particular funds that,

in good conscience, belong to petitioners, but that petitioners are contractually entitled to some

funds for benefits that they conferred," there is no viable cause of action under § 502(a)(3).  Id. at

214.

　　　　A legion of cases from this Circuit has applied the Supreme Court's holding in Great-West

to bar claims such as the one brought here by Paneccasio, including claims for breach of fiduciary

duty.  See Kishter v. Principal Life Ins. Co., 186 F. Supp. 2d 438, 445 (S.D.N.Y. 2002) (rejecting availability of § 502(a)(3) in breach of fiduciary duty claim: "such an action cannot be considered an action for restitution or one implicating a constructive trust because, under Great-West Life, such remedies are appropriate only where the specific property being sought is identifiable and in the hands of the defendant"); Augienello v. Coast-to-Coast Fin. Corp., No. 01 Civ. 11608 (RWS), 2002 U.S. Dist. Lexis 14584 (S.D.N.Y. Aug. 12, 2002) (plaintiffs could not pursue a claim under § 502(a)(3) because their suit for breach of fiduciary duty was not one for equitable relief).  Cases from other Circuits are universally in accord.  See In re Enron Corp. Sec., 284 F. Supp. 2d 511, 603-12 (S.D. Tex.. 2003) (canvassing case law from around the country and concluding that "[n]o matter how artfully pled, 'make-whole' relief for a claim of breach of fiduciary duty by a trustee cannot cloak a claim for compensatory damages").

Because there is no evidence – indeed, no allegation – that the Unisource Defendants hold any funds even arguably belonging to Paneccasio, and because his claim is clearly one for compensatory damages, the Supreme Court's decision in Great-West and its progeny are dispositive of Paneccasio's claim under § 502(a)(3).  ERISA's thoughtful and complete framework precludes any action by Paneccasio against the Unisource Defendants, and this Court should grant summary judgment in their favor on his groundless complaint.

**E.    Even If The Unisource Defendants Were Proper Defendants, There Has Been No ERISA Violation In This Case.**

Even if Paneccasio could, somehow, articulate a basis under which the Unisource Defendants could have potential ERISA liability, his claim would founder on the fact that there has been no violation of ERISA in this case.  As set forth above, it is undisputed that the 1991 Plan provided for its potential future termination at the discretion of the Alco Standard (now IKON) Board; that the IKON Board's exercise of its discretion to terminate the Plan was entirely proper

and legal; and that every Plan participant, including Paneccasio, received the distribution to which he was entitled according to the Plan's explicit terms. (<u>See</u> Plan and Prospectus at 14, Ex. C to Rule 56(a)(1) Statement; Hope Dep. at 122-23, Ex. B to Rule 56(a)(1) Statement; <u>see also</u> January 3, 2001 E-mail from Woody Hope to Carol McGowan, Ex. H to Rule 56(a)(1) Statement; June 21, 2000 Letter from W.J. Hope to Gary Melampy, Ex. I to Rule 56(a)(1) Statement.) Paneccasio himself agreed that his "vesting" entitled him only to remain in the 1991 Plan following his retirement from employment with Unisource. (<u>See</u> Paneccasio Dep. at 86-87, Ex. A to Rule 56(a)(1) Statement).

Indeed, a court in this Circuit recently has squarely rejected a challenge to IKON's termination of the Plan, and has specifically approved of IKON's calculation and distribution of payments to all Plan participants whose benefit payments had not yet commenced – <u>including those who had "vested" prior to the Plan's termination</u>. <u>See</u> September 13, 2004 Opinion and Order in <u>Holcomb v. IKON Office Solutions, Inc.</u>, No. 2:03-CV-106 (copy attached hereto as Exhibit 3).

In <u>Holcomb</u>, the plaintiff claimed that the IKON Board's decision to terminate the Plan was improper. <u>Id</u>. The Court rejected this claim, granting summary judgment to IKON. <u>Id</u>. Importantly, the Court noted that, for purposes of determining a Plan participant's entitlement to benefits upon termination of the Plan, whether or not that participant has "vested" is simply not relevant:

> Vesting would have determined what benefits [a participant] would have received upon retirement or age 65, even if he left the company, if the Plan had continued. . . . The termination clause in the Plan governed the benefits he would receive in the event that the Plan was terminated, <u>even if he had been fully vested at the time of termination</u>.

<u>Id</u>. at 4 n.1 (emphasis added).

The Vermont court's finding in Holcomb that IKON legitimately terminated the Plan, and correctly paid out the termination benefit to all Plan participants whose benefits had not yet commenced, applies with equal force in this case. Paneccasio has no basis in fact or law for his argument that the Plan's termination or the payment made to him violated ERISA.

In desperation, Paneccasio has suggested that the doctrine of equitable estoppel supports his purported claim under ERISA. See Compl. at 24. This doctrine, however, requires "(1) a material misrepresentation; (2) reasonable reliance on that misrepresentation; and (3) injury attributable to such reliance." Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993). As set forth above, there is no evidence tending to suggest, let alone prove, that the Unisource Defendants made any misrepresentations to Paneccasio, material or otherwise. Instead, the record is clear that all of the facts provided to Paneccasio were accurate, and that any promises made to him were fulfilled.

First, Unisource never made any false promises to Paneccasio. He was offered, and received, "vesting" in the 1991 Plan – the opportunity to remain in the Plan, in accordance with its terms, despite having terminated his employment from Unisource. (See Retirement Package at 2, Ex. D to Rule 56(a)(1) Statement.) Absent this "vesting," Paneccasio would have received back his contributions plus 6 percent interest as of April 1, 1994. (See Plan and Prospectus at 2, 10-11, Ex. C to Rule 56(a)(1) Statement; Paneccasio Dep. at 86-87, Ex. A to Rule 56(a)(1) Statement; cf. Holcomb, Ex. 3 hereto.) The Retirement Package that Paneccasio ostensibly relied on to learn the terms of the early retirement offer explicitly stated that the provisions set forth in official plan documents, such as the 1991 Plan, would continue to govern interpretation of those plans. (See Retirement Plan at 12, Ex. D to Rule 56(a)(1) Statement.) Those Plan documents in turn made clear that the IKON Board of Directors retained the right to terminate the Plan and that participants

whose benefits had not yet commenced, regardless of whether they were "vested," would receive the same termination benefit of deferrals plus six percent.  (See Plan and Prospectus at 14, Ex. C to Rule 56(a)(1) Statement.)   Accordingly, Paneccasio can point to no false promises, and therefore no basis for a claim of inducement.

Second, Unisource never reneged on any promises it made to Paneccasio.  Paneccasio's conclusion to this effect is predicated on his assertion that all of the defendants in this case are "interrelated," and that "a decision had to be made by those three companies, apparently, to terminate the plan."  (Paneccasio Dep. at 151, Ex. A to Rule 56(a)(1) Statement.)  This wildly speculative assertion has no basis in fact.  Indeed, after Paneccasio left employment with Unisource in 1994, the company was spun off from Alco Standard, becoming an independent entity and leaving behind both the 1991 Plan and the Plan's administration and control.  (See Hope Dep. at 14-16, Ex. B to Rule 56(a)(1) Statement; see also Special Report to Shareholders, Ex. E to Rule 56(a)(1) Statement.)  Georgia-Pacific, which acquired Unisource more than two years later, never had any control over the 1991 Plan nor any corporate relationship with Alco Standard or IKON.  (See Melampy Aff. at ¶¶ 4, 9, Ex. F to Rule 56(a)(1) Statement.)

Therefore, the decision, in 2000, of the IKON Board of Directors to terminate the Plan and to pay out a termination benefit to all former participants, could not constitute "reneging" by the Unisource Defendants, because the record is uncontroverted that it was not an action of the Unisource Defendants.  Paneccasio has no evidence to the contrary, and there is none.  (See Paneccasio Dep. at 140, Ex. A to Rule 56(a)(1) Statement; see also Melampy Aff. at ¶ 9, Ex. F to Rule 56(a)(1) Statement; June 23, 2000 Letter from Gary Melampy, Ex. J to Rule 56(a)(1) Statement.)

Whether brought under the rubric of a fiduciary claim, a non-fiduciary claim, or the principles of equitable estoppel, this complaint simply does not set forth a cause of action under ERISA. As such, this Court should grant summary judgment to the Unisource Defendants.

III.     **The Unisource Defendants Are Entitled To Summary Judgment On Paneccasio's Age Discrimination Claim.**

Paneccasio's claim of age discrimination is simply a recasting of his claim under ERISA, with the additional allegation that the Unisource Defendants' alleged action or inaction was taken on account of his age. As set forth above, there is no factual basis for a conclusion that the Unisource Defendants' conduct violated any law or any legal obligation to Paneccasio. Moreover, there is no evidence from which it can be inferred that any action taken toward Paneccasio was on account of his age. As such, the Unisource Defendants are entitled to summary judgment on Paneccasio's age discrimination claim.

In order to prevail on his claim for age discrimination, Paneccasio would first have to establish a prima facie case that (1) he is a member of a protected class; (2) he is qualified for his position; (3) he has suffered adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination. See Bluight v. Consol. Edison Co., No. 00 Civ. 3309, 2002 U.S. Dist. Lexis 1845, at *12 (S.D.N.Y. Feb. 5, 2002). While it is undisputed that Paneccasio was over 40 at all relevant times and that he was qualified for his position at the time he took early retirement, there is no evidence that he suffered an adverse employment action, or that there are any circumstances present in this case that give rise to an inference of discrimination. As such, Paneccasio cannot meet the requirements of a prima facie case, and his age discrimination claim should be dismissed. Moreover, by Paneccasio's own admission, he waited until July 2001 – more than seven years after he left his employment at Unisource – to claim age discrimination, well after the 300-day cutoff imposed by law. See 29 U.S.C. § 626(d)(2). While

71252438_1.DOC 034332-00210

-20-

Paneccasio now argues that this Court should apply equitable principles to salvage his claim, the facts of this case present no basis whatsoever for doing so.

A.    **Paneccasio Cannot Establish A Prima Facie Case Of Age Discrimination.**

There is no factual basis from which this Court could conclude either that Paneccasio suffered any adverse employment action, or that the circumstances surrounding his departure from employment or the subsequent Plan termination support an inference of discrimination.

First, Paneccasio voluntarily terminated his employment with Unisource, accepting the early retirement package and the generous benefits that accompanied it.  It is well-settled that early retirement programs do not violate the ADEA.  See, e.g., Raskin v. Wyatt, 125 F.3d 55, 62 (2d Cir. 1997) (affirming summary judgment to employer where employee had claimed that an early retirement plan was evidence of discriminatory intent, and noting that "there is no prohibition against permitting early retirement . . . or offering inducements to retire early").  While Paneccasio testified that, in his mind, the fact that "you had to be age 55 in order to participate in" the early retirement plan (see Paneccasio Dep. at 138, Ex. A to Rule 56(a)(1) Statement) was evidence of its discriminatory nature, therefore, this contention is directly rejected by controlling Second Circuit law.  See Raskin, 125 F.3d at 62.  Accordingly, any claim of discrimination based on the early retirement program itself, or Paneccasio's voluntary participation in it, must be rejected.

Second, Paneccasio also suggests that the termination of the Plan in 2000, some six years after he left his employment with Unisource, was an adverse employment action.  (See Compl. at 6-7.)  This is a curious contention, given that at the time of the Plan's termination, Paneccasio had no "employment" with Unisource to affect adversely.  Moreover, even assuming that Paneccasio somehow could resurrect his prior status as an employee for purposes of evaluating actions that took place in 2000, as a matter of law the termination of the Plan cannot be deemed age-

discriminatory, where it indisputably affected all employees regardless of their age. Second

Circuit case law is pellucid on this point. See, e.g., Delvin v. Transp. Communications Int'l

Union, 175 F.3d 121, 126 (2d Cir. 1999) (affirming trial court's conclusion that elimination of a

benefit fund "did not violate the ADEA because the plaintiffs could not show discrimination, much

less unlawful discrimination . . . [since] the Fund was terminated as to all members and retirees,

not just the older constituents").

      Given that Paneccasio did not suffer any adverse action and has presented no

circumstances tending to support an inference of discrimination, his age claim against the

Unisource Defendants must be dismissed.

**B.    Paneccasio's Age Discrimination Claim Is Time-Barred.**

      Even if there were some basis for Paneccasio's age discrimination claim, that claim cannot

be sustained where, by Paneccasio's own admission, it was not brought until seven years after his

participation in the early retirement program – obviously, well beyond the 300-day limit prescribed

by law. See 29 U.S.C. § 626(d)(2) (prescribing 300-day time limit); see also Russo v. Trifari,

Krussman & Fishel, Inc., 837 F.2d 40, 42-43 (2d Cir. 1988) (the filing period begins when the

employment decision is made and communicated to the plaintiff). While Paneccasio attempts to

salvage his age claim through the related vehicles of equitable tolling and equitable estoppel,

arguing that the defendants concealed pertinent information from him at the time that he took early

retirement and made false promises to him, neither equitable doctrine can avail him under the

circumstances here.

      As set forth at Section II.E., *supra*, Paneccasio's equitable argument founders on the facts,

which show no support for his speculation that the Unisource Defendants somehow knew in 1994

that the Plan would be terminated in 2000 and chose not to disclose that knowledge to him.

Indeed, as set forth above, there is no evidence that the Unisource Defendants were aware that the

IKON Board, an unrelated corporate entity, would terminate the Plan some six years later.

Moreover, the record clearly demonstrates that Paneccasio was advised at the time he accepted

early retirement that the terms of the 1991 Plan, which provided for termination and a defined

termination benefit, would continue to govern.  (See Retirement Package at 12, Ex. D to Rule

56(a)(1) Statement; Plan and Prospectus at 14, Ex. C to Rule 56(a)(1) Statement.)  As such, the

contention that the Unisource Defendants concealed pertinent information or made false promises

flies in the face of clearly established record facts, and must be rejected.

## C.    Georgia-Pacific Cannot Be Held Liable For Age Discrimination Where It Never Employed Paneccasio.

Even if Paneccasio could muster facts sufficient to support an age discrimination claim

against Unisource, which as set forth above he has not done and cannot do, he has no basis

whatsoever to maintain such a claim against Georgia-Pacific.

Paneccasio has acknowledged that he was employed by Unisource; that his employment

with Unisource terminated as of April 1994; and that Georgia-Pacific did not acquire Unisource

until July 1999, some five years after his departure.  (See Paneccasio Dep. at 9, 49-50, Ex. A to

Rule 56(a)(1) Statement; Melampy Aff. at ¶ 4, Ex. F to Rule 56(a)(1) Statement.)  Under these

facts, as a matter of law, Georgia-Pacific cannot be held liable for age discrimination, where it

never employed Paneccasio.

The reach of the ADEA and Title VII, with respect to discriminatory employment

practices, is limited to "employers."  See 29 U.S.C. § 630(b).  In determining whether an affiliated

corporation is an "employer" for purposes of liability under the ADEA, a court should examine

whether the entity "made the final decisions regarding employment matters related to the person

claiming discrimination." <u>Cook v. Arrowsmith Shelburne, Inc.</u>, 69 F.3d 1235, 1240 (2d Cir. 1995).

In this case, it is clear and undisputed that Georgia-Pacific never made <u>any</u> decisions concerning Paneccasio's employment, because he had left his employment at Unisource years before the company's acquisition by Georgia-Pacific.  As such, under Second Circuit law, Georgia-Pacific cannot be considered an "employer" of Paneccasio and accordingly cannot be liable for age discrimination under any circumstances.

## **CONCLUSION**

For the reasons set forth above, the Unisource Defendants respectfully request that this Court enter an Order (1) granting summary judgment to the Unisource Defendants on Paneccasio's Complaint and (2) granting such other and further relief as the Court deems just and proper.

Respectfully submitted,


THE DEFENDANTS
UNISOURCE WORLDWIDE, INC.
GEORGIA-PACIFIC CORPORATION


_____
Felix J. Springer (ct 05700)
Jennifer L. Sachs (ct 20684)
Day, Berry & Howard, LLP
CityPlace I
Hartford, CT  06103-3499
Tel:  860/275-0100
Fax: 860/275-0343
E-mail: fjspringer@dbh.com
         jlsachs@dbh.com

Rayne Rasty (ct 24918)
Georgia-Pacific Corporation
133 Peachtree St. NE
Atlanta, GA  30303
Tel:  404/652-4972
Fax:  404/584-1461
E-mail:  rmrasty@gapac.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this date, I served a copy of the foregoing via first-class mail, postage prepaid to:

Andrew B. Bowman, Esq.
1804 Post Road East
Westport, CT 06880

Kay Kyungsun Yu
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103

Robert L. Wyld
Patrick Fahey
Shipman & Goodwin
1 American Row
Hartford, CT  06103

_____
Felix J. Springer