# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| EUGENE PANECCASIO, | ) |
| | ) Civil Action No. 3:01 CV 2065 (CFD) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNISOURCE WORLDWIDE, INC., | ) |
| GEORGIA-PACIFIC CORPORATION, | ) |
| ALCO STANDARD CORPORATION, and | ) |
| IKON OFFICE SOLUTIONS, INC., | ) |
| | ) |
| Defendants. | ) October 29, 2004 |

### UNISOURCE DEFENDANTS' RULE 56(a)(1) STATEMENT
### OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56(a)(1), defendants Unisource Worldwide, Inc. ("Unisource") and Georgia-Pacific Corporation ("Georgia-Pacific") (collectively referred to as the "Unisource Defendants") respectfully submit the following statement of material facts as to which there is no dispute.

I. **Paneccasio Signed Up To Participate In The 1991 Plan After Being Fully Advised As To Its Provisions And The Possibility That It Could Legally Be Terminated.**

1.  Eugene Paneccasio ("Paneccasio") began his employment with Unisource, then called Rourke Eno, in 1971, and by 1994 was a vice president of sales and national accounts at the company. (Paneccasio Dep. at 9.)[1]

---

[1] Relevant portions of the August 26, 2003 Deposition of Eugene Paneccasio ("Paneccasio Dep.") are attached hereto as Exhibit A.

71254549_1.DOC  034332-00210

2. At that time, Unisource was a wholly owned subsidiary of Alco Standard Corporation, which later changed its name to IKON Office Solutions, Inc. (Hope Dep. at 16.[2])

3. In or about November 1990, Paneccasio elected to participate in a deferred compensation plan offered to employees of Alco Standard and certain of its subsidiaries, including Unisource, and effective commencing January 1, 1991. (See Paneccasio Dep. at 25, 31-32, Ex. A hereto.)

4. The Plan was offered only to certain "highly compensated" employees of Alco Standard and its subsidiaries who met a qualifying income threshold of $100,000. (Alco Standard Corporation 1991 Deferred Compensation Plan and Prospectus ("Plan and Prospectus"), attached hereto as Exhibit C, at 1.) It permitted these highly compensated employees to defer a portion of their income until retirement, and additionally to purchase life insurance pursuant to a "split-dollar" arrangement with Alco Standard. (Id. at 2-3.)

5. The Plan and Prospectus, provided to prospective participants including Paneccasio (see Paneccasio Dep. at 35-36, Ex. A hereto), clearly explained how the Plan was to operate. Two provisions are especially relevant here. First, the Plan provided that employees whose employment terminated prior to "vesting," which ordinarily occurred after ten calendar years of service beginning with the effective date of the Plan, would not be entitled to remain in the Plan. Instead, they would receive the amount of their deferrals, without interest. (See Plan and Prospectus, Ex. C hereto, at 11.)

6. Second, the Plan contained a provision explicitly permitting its termination at the sole discretion of Alco Standard's Board of Directors. In the case of termination, participants

---

[2] Relevant portions of the July 6, 2004 Deposition of Walter J. Hope, Jr. ("Hope Dep.") are attached hereto as Exhibit B.

would receive distributions based not on whether they were "vested" (had completed ten calendar years of service from January 1, 1991), but on whether they had begun to receive benefits at the time:

> 19.    Termination.  <u>The Board of Directors of Alco shall have the right to terminate the Plan</u> in its entirety and not in part at any time it determines that proposed or pending tax changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco.  In such event, Alco shall have no liability or obligation under the Plan or the Participant's Participation Agreement (or any other document), provided that 1) <u>Alco distributes, in lump sum to any Participant whose benefit payments have not commenced, the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum</u>; and 2) Alco distributes, in a lump sum, to any Participant whose benefit payments have commenced, all amounts thereafter due . . . .  Such lump-sum distribution, at Alco's election, may be made in the form of cash, or life insurance, or both.

(<u>See id</u>. at 14) (emphasis added).

## II.    **Paneccasio Took Early Retirement in April 1994, Thereby Obtaining Numerous Financial Benefits Not Otherwise Available To Him.**

7.    In 1994, Unisource extended an offer of early retirement to certain of its employees, including Paneccasio.  (Paneccasio Dep. at 49, Ex. A hereto.)

8.    The early retirement program had a number of significant financial components, including (1) a one-time cash bonus of up to $7500; (2) full vesting in the company's retirement plan; (3) continued medical coverage until age 65; and (4) term life insurance paid for by Unisource.  (<u>See</u> brochure titled "Your Personal Early Retirement Package" ("Retirement Package"), attached hereto as Exhibit D.)

9.    Additionally, participants in the early retirement program were offered the chance to become "vested," as that term was defined in the 1991 Plan, and to leave a portion of their contributions in the Plan which they would otherwise have had to remove by virtue of the

cessation of their employment. (See Retirement Package at 2, Ex. D hereto; Plan and Prospectus at 2, 10-11, Ex. C hereto.)

10. W.J. Hope, an IKON employee who subsequently became the Plan Administrator for the 1991 Plan, testified that this type of "vesting," to prevent an immediate lump-sum distribution of deferrals, was not uncommon:

> It is possible, and it has [been done] in various agreements, for an agreement to give, quote, vesting, closed quote, and thereby protect one from an immediate payout and preserve whatever rights they might otherwise have under the plan.

(Hope Dep. at 78, Ex. B hereto.)

11. Paneccasio understood that, absent this "vesting," he would have received his contributions without interest when he took early retirement. (Paneccasio Dep. at 86-7, Ex. A hereto; see also Plan and Prospectus at 14, Ex. C hereto.)

12. The Retirement Package clearly specified that the provisions of the 1991 Plan would continue in full force and effect, and that they would govern over any representations in the Retirement Package brochure:

> [T]he benefits described in this brochure are only summaries of the Early Retirement window's major provisions. More detailed information is available from the plan documents and insurance contracts. In case of any dispute, the official legal documents or contracts will govern over this brochure.

(See Retirement Package at 12, Ex. D hereto; see also Paneccasio Dep. at 60-61, Ex. A hereto.)

13. Paneccasio elected to take the early retirement option and retired in approximately April 1994. (See Paneccasio Dep. at 50, 62, Ex. A hereto.)

14. Years later, as of January 1, 1997, Alco Standard – which at the same time changed its name to IKON – spun off Unisource into an independent entity. (See Hope Dep. at 14-16, Ex. B hereto; see also Special Report to Shareholders, attached hereto as Ex. E.)

15. Georgia-Pacific acquired Unisource in July 1999, with Unisource continuing to retain its separate corporate identity. See Affidavit of Gary Melampy at ¶¶ 4-5 ("Melampy Aff."), attached hereto as Exhibit F.)

16. In the meantime, after it spun off Unisource, IKON retained full control over the administration of the 1991 Plan. (See Hope Dep. at 18-22, Ex. B hereto.)

III. **IKON Terminated The 1991 Plan Pursuant To Its Explicit Provisions And Made Distributions As Required Under The Plan, Including To Paneccasio.**

17. In 2000, the IKON Board of Directors decided to terminate the Plan, pursuant to its conclusion that "tax law changes or other events [have] cause[d], or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco." (Plan and Prospectus at 14, Ex. C hereto.)

18. The decision to terminate was made exclusively by the Board of Directors, with input limited to a few other employees of IKON. (Hope Dep. at 43-50, Ex. B hereto.) Through W.J. Hope, the Plan Administrator, IKON notified Plan participants including Paneccasio of the pending termination, which was to be effective as of December 31, 2000. (Undated Termination Letter, attached hereto as Exhibit G; Paneccasio Dep. at 76-77, Ex. A hereto.)

19. Upon termination, the Plan provided for all participants (whether "vested" or not) whose benefit payments had not yet commenced to receive their deferrals plus 6 percent interest. (Plan and Prospectus at 14, Ex. C hereto.) Paneccasio, whose benefit payments had not commenced, accordingly was issued a lump-sum distribution comprising his deferrals plus 6 percent interest. (Paneccasio Dep. at 91-2, Ex. A hereto.)

20. Some 25 other former Plan participants were "vested" at the time of termination pursuant to separation or early retirement agreements, but all similarly received in a lump-sum distribution their deferrals plus 6 percent interest. (See Hope Dep. at 122-23, Ex. B hereto; see

also January 3, 2001 E-mail from Woody Hope to Carol McGowan, attached hereto as Exhibit H; June 21, 2000 Letter from W.J. Hope to Gary Melampy, attached hereto as Exhibit I.)

21.     Neither Unisource nor Georgia-Pacific, which had in the meantime acquired Unisource, had any involvement in the November 2000 decision to terminate the 1991 Plan or in the calculation of payments due to Plan participants.  (See Melampy Aff. at ¶ 9, Ex. F hereto.)

22.     Indeed, the Plan documents did not on their face afford any role in this decision to either of the Unisource Defendants, and in fact no agent of Unisource or Georgia-Pacific participated in the decision.  (Id.; see also June 23, 2000 Letter from Gary Melampy to W.J. Hope, attached hereto as Exhibit J.)  Hope, the Plan Administrator, met with some employees of Georgia-Pacific concerning the pending termination only after the decision to terminate had been made, and pursuant to a notice requirement that stemmed from Alco Standard's spinoff of Unisource.  (Hope Dep. at 53, 62, Ex. B hereto.)

Respectfully submitted,

THE DEFENDANTS
UNISOURCE WORLDWIDE, INC.
GEORGIA-PACIFIC CORPORATION

_____
Felix J. Springer (ct 05700)
Jennifer L. Sachs (ct 20684)
Day, Berry & Howard, LLP
CityPlace I
Hartford, CT 06103-3499
Tel: 860/275-0100
Fax: 860/275-0343
E-mail: fjspringer@dbh.com
          jlsachs@dbh.com

Rayne Rasty (ct 24918)
Georgia-Pacific Corporation
133 Peachtree St. NE
Atlanta, GA 30303
Tel: 404/652-4972
Fax: 404/584-1461
E-mail: rmrasty@gapac.com

## **CERTIFICATE OF SERVICE**

This is to certify that on this date, I served a copy of the foregoing via first-class mail, postage prepaid to:

> Andrew B. Bowman, Esq.
> 1804 Post Road East
> Westport, CT 06880
>
> Kay Kyungsun Yu
> Pepper Hamilton LLP
> 3000 Two Logan Square
> Eighteenth and Arch Streets
> Philadelphia, PA 19103
>
> Robert L. Wyld
> Patrick Fahey
> Shipman & Goodwin
> 1 American Row
> Hartford, CT  06103

_____

Felix J. Springer