IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

EUGENE PANECCASIO                          :
                                           :    CIVIL ACTION
                        Plaintiff,         :
                                           :
             v.                            :    NO. 3:01CV2065(CFD)
                                           :
UNISOURCE WORLDWIDE, INC., et al.          :
                                           :
                        Defendants         :    October 29, 2004
                                           :

_____

## THE IKON DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT

**I.    STATEMENT OF UNDISPUTED FACTS**

   **A.    The 1991 Deferred Compensation Plan**

   1.    On or about September 12, 1990, Alco Standard Corporation ("Alco"), IKON's

predecessor, established the Alco Standard Corporation 1991 Deferred Compensation Plan.

(Declaration of Walter J. Hope, Jr. ("Hope Decl.") ¶ 4, attached to Appendix as Exhibit 1.)

   2.    On or about January 23, 1997, Alco changed its name to IKON and the Plan

subsequently was amended to change all references from Alco Standard Corporation to IKON

Office Solutions, Inc.  (Hope Decl. ¶ 6, App. Ex. 1; <u>see also</u> Deposition of Walter J. Hope, Jr.

("Hope Dep.") 15:10-16:21, App. Ex. 5.)

   3.    The Plan stated that:

> The purpose of the Alco Standard Corporation 1991 Deferred Compensation Plan
> is to permit certain eligible employees of Alco Standard Corporation and its
> affiliated companies to defer a portion of their compensation and to participate in
> a program under which they are provided supplemental income after their
> retirement and survivor protection both before and after retirement.  The program
> is intended to constitute an unfunded deferred compensation arrangement for a
> select group of management or highly compensated employees.

See 1991 Deferred Compensation Plan and Prospectus (the "Plan"), Section 1 (IKCP 113, App. Ex. 3).

4.      As "an unfunded deferred compensation arrangement for a select group of management or highly compensated employees," the Plan constituted what is commonly referred to as a top hat plan, the terms of which are enforceable under ERISA. (Hope Decl. ¶ 5, App. Ex. 1.)

5.      Participation in the Plan was offered to a small group of Alco's highly compensated employees and furnished benefits that were in addition to, not in lieu of, other retirement benefits provided under IKON's traditional pension plan. (Hope Decl. ¶ 7, App. Ex. 1.)

**1.      The Plan's Vesting Provision**

6.      Section 5 of the Plan defined the term "Vesting" as follows:

> A Participant shall vest in the benefits to be provided hereunder after he has completed ten calendar years of service with an Employer, beginning with the Effective Date. Notwithstanding such vesting, a Participant's entitlement to the life insurance purchased pursuant to the Split Dollar Arrangement is conditional on his making payments for specified life insurance costs, which payments shall continue after vesting has occurred and following termination of employment, until such time as the death benefit is paid, or until the Participant reaches age 65.

> * * * *

> Each other Participant whose employment terminates prior to vesting (other than on account of death, as described in Paragraph 6, below) shall be entitled to receive, in a lump sum payment, the full amount of the Participant's deferrals to the date of termination, without interest. No other benefits shall be payable under the Plan to such Participant, nor shall the Participant be entitled to continue payments for the life insurance. All life insurance benefits shall terminate upon such termination of employment.

See Plan, Section 5 (IKCP 114-15, App. Ex. 3).

### 2.　　The Plan's Amendment and Termination Provisions

7.　　Section 17 of the Plan, which described the circumstances under which the Plan could be amended, provided that:

> This Plan shall remain in effect until termination by the Board of Directors of Alco. The Board of Directors shall have the power to amend this Plan at any time; provided, however, that, except as set forth in Paragraph 19 and/or Paragraph 21, no amendment or termination of this Plan shall have a material adverse effect upon a Participant unless he consents to such amendment or termination in writing.

See Plan, Section 17 (IKCP 118, App. Ex. 3).

8.　　The Plan also contained a termination provision, which stated that:

> The Board of Directors of Alco shall have the right to terminate the Plan in its entirety and not in part at any time it determines that proposed or pending tax law changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco. In such event, Alco shall have no liability or obligation under the Plan or the Participant's Participation Agreement (or any other document), provided that 1) Alco distributes, in lump sum, to any participant whose benefits have not commenced, the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum; and 2) Alco distributes, in a lump sum, to any Participant whose benefit payments have commenced, all amounts thereafter due, in an amount as calculated in accordance with Paragraph [20], "Acceleration of Benefits." Such lump-sum distribution, at Alco's election, may be made in the form of cash, or life insurance, or both.

See Plan, Section 19 (IKCP 118, App. Ex. 3).

### 3.　　The Termination Benefit

9.　　Upon the termination of the Plan, the benefit payable to a participant whose benefits had not yet commenced was "the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum." See Plan, Section 19 (IKCP 118, App. Ex. 3).

10.    The benefit payable to a participant whose benefits had already commenced was the amount thereafter due calculated in accordance with the Acceleration of Benefits provision of the Plan. See Plan, Section 19 (IKCP 118, App. Ex. 3).

11.    The benefits payable under Section 19 of the Plan will be referred to as the "Termination Benefit." See Plan, Section 19 (IKCP 118, App. Ex. 3).

### 4.    The Pre-Termination Benefit

12.    The benefits payable under the Plan prior to its termination were described as three separate options listed in Appendix A of the Plan (the "Pre-Termination Benefit"). See Plan, Appendix A (IKCP 120, App. Ex. 3).

13.    "Option II" of the Plan (the option that Paneccasio elected (PANE 594, App. Ex. 2)) provided that, during the life of the Plan, when a participant retired and reached age 65, whichever was later, he or she would receive retirement benefits in the amount of $15,000 per year for ten years and a $95,000 Cash Value Life Insurance Policy with a Paid-up Death Benefit of $375,000. See Plan, Section 6 and Appendix A (IKCP 115 & 120, App. Ex. 3).

### 5.    Discretionary Authority to Make Claims Determinations Under the Plan

14.    As described in the Plan's Prospectus, "[t]he Plan provides that authority for the administration and interpretation of the Plan will be vested in a Committee selected by the Board of Directors of Alco." See Plan at p. 5 (IKCP 109, App. Ex. 3).

15.    The Plan itself provided that it is to be "administered by a Committee selected from time to time by the Board of Directors of Alco (the "Committee")." See Plan, Section 14 (IKCP 117, App. Ex. 3).

16.    The Retirement Plans Committee was vested with the authority to administer the Plan. (Hope Decl. ¶ 3, App. Ex. 1.)

17.     The Retirement Plans Committee then selected "an Administrator from time to time to administer the Plan under the general policy guidance of the Committee." (Hope Decl. ¶ 2, App. Ex. 1.)

18.     Under the Plan, the Administrator was responsible for:

(a) maintaining any records necessary in connection with the Plan;
(b) making calculations under the Plan;
(c) interpreting the provisions of the Plan; and
(d) otherwise administering the Plan in accordance with its terms.

See Plan, Section 14 (IKCP 117, App. Ex. 3).

19.     Plan participants were permitted to appeal any adverse determinations made by the Plan Administrator to the Retirement Plans Committee, which had the authority to review the Administrator's determinations.  The Plan described its claims procedure as follows:

At any time the Administrator makes a determination adverse to a Participant or beneficiary with respect to a claim for benefits or participation under the Plan, the Administrator shall notify the claimant in writing of such determination, setting forth:

(a) the specific reason for such determination;
(b) a reference to the specific provision or provisions of the Plan on which such determination is based;
(c) a description of any additional material or information necessary to perfect the claim, and an explanation of the reason that such material is required; and
(d) an explanation of the rights and procedures set forth in this Paragraph 15.

A person who receives notice of an adverse determination by the Administrator with respect to a claim may request, within 60 days of receipt of such notice, that the Committee review the Administrator's determination.  This request may be made on behalf of a claimant by a duly authorized representative.  The claimant or representative may review pertinent documents and submit issues and comments with respect to the controversy to the Committee.  The Committee shall render a decision within 60 days of a request for review (or within 120 days under special circumstances), which decision shall be in writing and shall set forth the specific reasons for the decision reached and the specific provisions of the Plan on which the decision is based.  A copy of the ruling shall be forwarded to the claimant.

See Plan, Section 15 (IKCP 117-18, App. Ex. 3).

-5-

**B.    Paneccasio's Participation in the Plan**

20.    In 1990, Alco offered Paneccasio the opportunity to participate in the Plan. On November 28, 1990, Paneccasio signed a Participation Agreement, electing to participate in the Plan under Option II. See Paneccasio's Participation Agreement (PANE 594-97, App. Ex. 2).

21.    Paneccasio testified that he received a copy of the Plan when he was initially offered the opportunity to participate and that he carefully read and understood the terms of the Plan before electing to participate. (Deposition of Eugene Paneccasio ("Paneccasio Dep.") 31:16-25; 32:10-12; 33:8-14; 34:13-23, App. Ex. 4.)

22.    Section 8 of Paneccasio's Participation Agreement expressly provides that: "The Employee and Alco expressly agree that the terms of the Plan and as it may be hereafter amended from time to time, are incorporated herein by reference and that this Agreement shall be interpreted by reference to such Plan." (PANE 595, App. Ex. 2.)

23.    Paneccasio also executed a Split Dollar Insurance Agreement in connection with his participation in the Plan. (PANE 598-99, App. Ex. 2.)

24.    Under the Split Dollar Insurance Agreement, Paneccasio agreed that Alco would be the sole owner of the universal life insurance policy obtained to cover Paneccasio (the "Split Dollar Policy"). (PANE 598, App. Ex. 2.)

**C.    Paneccasio's Retirement Under The Early Retirement Package From Unisource**

25.    Unisource was a subsidiary of Alco until December 31, 1996. (Hope Decl. ¶ 9, App. Ex. 1; Hope Dep. 14:5-7, App. Ex. 5.)

26.    Effective January 1, 1997, Alco spun off Unisource and it became a separate corporate entity unrelated to Alco. (Hope Dep. 14:5-24, App. Ex. 5; Hope Decl. ¶ 10, App. Ex. 1.)

27.     In July 1999, Georgia-Pacific acquired Unisource. (Hope Decl. ¶ 11, App. Ex. 1; see also Hope Dep. 71:14-72:3, App. Ex. 5.)

28.     As entities completely separate and unrelated to IKON, neither Unisource nor Georgia-Pacific has any interrelation of operations, centralized control of labor relations, or common management with IKON. Nor does IKON have any common ownership or financial control of Unisource or Georgia-Pacific. (Hope Decl. ¶ 22, App. Ex. 1.)

29.     Paneccasio testified that IKON and Georgia-Pacific are two completely unrelated corporate entities. (Paneccasio Dep. 155:13-17, App. Ex. 4.)

30.     In February 1994, Paneccasio, as an employee on the payroll of Unisource who was age 55 or older on March 31, 1994, was offered a voluntary early retirement opportunity. The early retirement window was described in a booklet entitled "Your Personal Early Retirement Package: A Window of Opportunity." (IKCP 160-72, App. Ex. 3.)

31.     With respect to the 1991 Deferred Compensation Plan, the early retirement window provided that: "Benefits in the 1991 Plan will become 65% vested if you elected the five year option and 32.5% vested if you elected the ten year option. Under the 1991 Plan, you must continue to pay life insurance premiums to age 65." (IKCP 168, App. Ex. 3.)

32.     The final page of the early retirement booklet included the following caveat:

> In an effort to keep the language as clear and non-technical, yet correct, as possible, the benefits described in this brochure are only summaries of the Early Retirement window's major provisions. More detailed information is available from the plan documents and insurance contracts. In case of any dispute, the official legal documents or contracts will govern over this brochure.

(IKCP 172, App. Ex. 3.)

33.     Paneccasio voluntarily elected to retire under the 1994 early retirement window. (Paneccasio Dep. 62:17-19, App. Ex. 4.)

34.    In accordance with the terms of the early retirement window, Paneccasio was treated as 65% "vested" in the 1991 Plan, as that term is defined by the Plan. (IKCP 76, App. Ex. 3).

35.    Without this accelerated vesting, under the Plan's Vesting Provision, Paneccasio would have received a lump-sum payment of the full amount of his deferrals to the date of termination of employment, without interest, and would not have been eligible to receive any other benefit under the Plan. See Plan's Vesting Provision, Section 5 (IKCP 114-15, App. Ex. 3; see also Hope Dep. 75:3-17, App. Ex. 5).

36.    The total amount of Paneccasio's deferrals under the Plan was $46,283.25. (IKCP 83, App. Ex. 3.)

37.    With the accelerated vesting granted under the early retirement window, however, Paneccasio was permitted to continue to participate in the 1991 Plan notwithstanding his termination of employment from Unisource. (IKCP 76-79, 103, App. Ex. 3.)

38.    As a result of this accelerated vesting, Paneccasio received a Termination Benefit in the amount of $75,419.22, $29,135.97 more than he would have received without accelerated vesting. (IKCP 83, App. Ex. 3.)

**D.    IKON's Termination of the Plan**

39.    On July 21, 2000, in accordance with the termination provision set forth in Section 19 of the Plan, IKON's Board of Directors took action to terminate the Plan effective December 31, 2000. (Hope Decl. ¶ 15, App. Ex. 1; see also Hope Dep. 68:5-16, App. Ex. 5.)

40.    There were two primary reasons for the decision to terminate the Plan. First, declining interest rates caused a decrease in the rate of return on the individual Split Dollar Policies covering the Plan participants. Indeed, it was originally contemplated that the Split Dollar Policies would experience a cash value growth of 9% per year at the time of the Plan's

inception. In fact, the Split Dollar Policies experienced only a rate of return of 6% per year.

Second, the decrease in participant deferrals resulting from the divestiture of two subsidiaries, as

well as the termination of other IKON employees over the years, also caused the Plan to

negatively impact IKON. (Hope Decl. ¶ 16-19, App. Ex. 1.)

41.     In 1999, the Split Dollar Policies had a rate of return of approximately 6% per

year, down from the 9% per year originally contemplated at the time the Plan was first

established in 1991. (Hope Decl. ¶ 16, App. Ex. 1.)

42.     As a result, a cash outlay of $2.4 million was required for the Plan as opposed to

the $1.5 million originally assumed, and there was a negative earnings impact of $1.3 million as

opposed to the originally expected positive earnings impact of $1 million. (Hope Decl. ¶ 17,

App. Ex. 1.)

43.     It was estimated that, for the period from 2000 through 2004, had the Plan not

been terminated and assuming the Split Dollar Policies continued to achieve a 6% rate of return,

IKON would have suffered a cash outlay of an additional $2.2 million per year as opposed to

$1.4 million per year as originally assumed, and a negative impact on earnings of $1 million per

year as opposed to a positive $0.7 million per year as originally projected. (Hope Decl. ¶ 18,

App. Ex. 1.)

44.     In addition to the decrease in the rate of return on the Split Dollar Policies that

resulted from declining interest rates, the number of participants making deferrals and thereby

contributing to the Plan diminished, which also contributed to the Plan's negative impact on

IKON. (Hope Decl. ¶ 19, App. Ex. 1.)

45.    The decision of IKON's Board to terminate the Plan was based solely on its determination that continuing the Plan would cause an adverse financial impact IKON.  (Hope Decl. ¶ 20, App. Ex. 1; see also Hope Dep. 47:6-48:16, 68:5-16, App. Ex. 5.)

46.    When the Plan was terminated on December 31, 2000, Paneccasio had not yet reached age 65 and, therefore, had not become eligible to commence benefits under the Plan. See Plan, Section 6 (IKCP 115, App. Ex. 3).

47.    Consequently, Paneccasio was informed that he would be paid the Termination Benefit in accordance with the Plan's termination provision. See Plan, Section 19  (IKCP 118, App. Ex. 3); Letter to Eugene Paneccasio mailed October 18, 2000 (IKCP 83-87, App. Ex. 3).

48.    On the effective date of the Plan's termination, neither IKON nor any other of the IKON Defendants was Paneccasio's employer.  (Hope Decl. ¶ 23, App. Ex. 1.)

**E.    Paneccasio's Claim Under the Plan**

49.    Paneccasio was initially informed of the decision to terminate the Plan in October 2000.  In a letter mailed to Plan participants on October 18, 2000, the Plan Administrator, Walter J. Hope, Jr., explained that:

> the Plan allows IKON's Board of Directors to terminate the Plan if the Board of Directors determines that events have caused, or are likely in the future to cause, the Plan to have an adverse financial impact upon IKON.  Accordingly, pursuant to the terms and conditions of the Plan, the Board of Directors of IKON has taken action to terminate the Plan effective December 31, 2000, at which time you will have the right to the termination benefit prescribed by the Plan.  At that time all other rights under the Plan will cease.  We anticipate issuing checks for all termination benefits to participants during January 2001.

(IKCP 87, App. Ex. 3.)

50.    The October 18, 2000 letter to Paneccasio enclosed a copy of the Plan, along with other Plan information, notified him that he had made deferrals to the Plan in the amount of

$46,283.25, and estimated the amount of his Termination Benefit to be $75,419.22. (IKCP 83-86, App. Ex. 3.)

51.    The document entitled "Questions & Answers Regarding Plan Termination," included with the October 18, 2000 letter, provided the following, in response to the question, "Why has IKON chosen to terminate the Plan?"

> The Plan allows IKON's Board of Directors to terminate the Plan if the Board of Directors determines that events have caused, or are likely in the future to cause, the Plan to have an adverse financial impact upon IKON.
>
> The Plan is supported by life insurance policies issued by Metropolitan Life Insurance Company. Interest rates used to credit investment gain to the cash value portion of the Metropolitan policies has fallen dramatically since 1991. Decrease in the crediting rate has had a material adverse affect on IKON and is expected to have an adverse affect in the foreseeable future.

(IKCP 85, App. Ex. 3.)

52.    In response, Paneccasio sent a letter to the Plan Administrator dated November 8, 2000, stating that, because he was 65% vested in the Plan under the early retirement window, he believed that he was entitled to additional benefits beyond the Termination Benefit. (IKCP 90-92, App. Ex. 3.)

53.    On November 30, 2000, the Plan Administrator wrote back to Paneccasio acknowledging that he was 65% vested and explained that: "In the absence of extending such vesting, your deferrals in the IKON Office Solutions, Inc. 1991 Deferred Compensation Plan would have been returned to you upon termination of your employment with Unisource." (IKCP 96, App. Ex. 3.)

54.    The Plan Administrator explained further that the Plan's Vesting Provision did not supercede the Plan's Termination Provision and that Paneccasio would, therefore, receive the Termination Benefit described in the October 18, 2000 letter. (IKCP 96, App. Ex. 3.)

55.     On December 6, 2000, the Plan Administrator sent another letter to Plan participants, including Paneccasio, enclosing information regarding various government filings relating to the Plan, along with an additional copy of the Plan with two Plan amendments. (IKCP 104-41, App. Ex. 3.)

56.     Thereafter, on December 19, 2000, the Plan Administrator provided Paneccasio and all other Plan participants the opportunity to take a MetLife universal life insurance policy in lieu of the lump sum termination benefit, which life insurance policy would have a cash surrender value equal to the after-tax value of the participant's Termination Benefit.  (IKCP 147, App. Ex. 3.)

57.     On January 2, 2001, the Plan Administrator sent a letter to Paneccasio confirming that he was to receive a Termination Benefit in the amount of $75,419.22.  (IKCP 148, App. Ex. 3.)

58.     In the meantime, on December 15, 2000, Michael Donoghue, an attorney representing Paneccasio, wrote to the Plan Administrator stating that Paneccasio viewed his November 10, 2000 letter as a denial of Paneccasio's claim for benefits, requested an appeal form, and stated Paneccasio's intent to appeal the denial.  (IKCP 143-44, App. Ex. 3.)

59.     On January 24, 2001, the Plan Administrator informed Paneccasio through his counsel that had the right to appeal the denial of his claim by requesting an appeal with the Retirement Plans Committee by stating the reasons upon which the appeal was based and providing any additional information that would be helpful to the Committee. (IKCP 151, App. Ex. 3.)

60.    On March 8, 2001, Paneccasio appealed the Plan Administrator's denial of

benefits stating that, in his view, he was entitled to the "vested" benefits stated in his early

retirement package. (IKCP 153-56, App. Ex. 3.)

61.    Upon request, Paneccasio's attorney provided certain materials cited in his letters.

See Letter from Plan Administrator dated March 30, 2001 (IKCP 157, App. Ex. 3); Letters from

Michael J. Donoghue dated April 10, 2001 and April 23, 2001 (IKCP 158-72 & 173-77, App.

Ex. 3).

62.    On July 3, 2001, Don H. Liu, a member of the Retirement Plans Committee,

wrote to Paneccasio's counsel to inform him that Paneccasio's claim for benefits was denied on

appeal. (IKCP 178-82.)

63.    The basis for the Committee's decision to uphold the Plan Administrator's denial

was stated as follows:

> It is uncontroverted that Section 19 of the Plan provides that the Plan may be
> terminated by IKON's Board of Directors (which the Board of Directors has) and
> provides specific procedures for making termination payments to Plan
> participants. The Plan Administrator determined that Mr. Paneccasio has received
> all benefits due to him under the Plan in connection with the termination of the
> Plan.
>
> Mr. Paneccasio, however, has argued that payment of the termination benefit,
> instead of the "vested" benefits he claimed he was entitled to, constituted a
> violation of ERISA's anti-cutback rules. This argument is erroneous because the
> anti-cutback provisions of ERISA do not apply to the Plan.
>
> The Plan clearly states in Section 1 of the Plan that it is a program that "intended
> to constitute an unfunded compensation arrangement for a select group of
> management or highly compensated employees." This type of program is
> commonly referred to as a top hat plan. Top hat plans are expressly exempted
> from most of ERISA's substantive requirements. See ERISA Sections 201(2),
> 301(a)(3) and 401(a)(1), 29 U.S.C. §§ 1051(2), 1081(a)(3) and 1101(a)(1).
> Specifically, the Plan, because it is a top hat plan, is exempted from the
> participation and vesting requirements of ERISA. Section 201(2) of ERISA
> provides, in relevant part that Part 2 "shall apply to any employee benefit plan
> described in section 4(a) . . . other than . . . a plan which is unfunded and is
> maintained by an employer primarily for the purpose of providing deferred

compensation for a select group of management or highly compensated employees. . . ." 29 U.S.C. § 1051(2). Section 204(g), 29 U.S.C. § 1054(g), which is the anti-cutback provision, is contained in Part 2 of ERISA and has no applicability to the Plan.

Moreover, as stated by the Plan Administrator, Mr. Paneccasio's "vesting" upon his early retirement merely provided that his contributions to the Plan would not be returned to him at that time and that he would continue to remain a participant in the Plan for as long as the Plan existed. The Committee has no reason to believe that Mr. Paneccasio's right to remain a participant in the Plan in any way invalidated the effect of the termination of [the] Plan pursuant to Section 19 of the Plan.

Mr. Paneccasio further claims that the Plan was amended by the Early Retirement Package and other documentation he received in 1994. The material that Mr. Paneccasio received in 1994 in no way constitutes a valid amendment of the Plan. This information was provided to Mr. Paneccasio to describe the various benefits he would receive under the Early Retirement Package. Part of those benefits was the accelerated vesting he received under the Plan, as that term is defined by the Plan. Please note in particular that under Section 17 of the Plan, the Plan may be amended only by the action of the Board of Directors.

(IKCP 181-82, App. Ex. 3.)

64.     On July 12, 2001, the Plan Administrator informed Paneccasio that, since the Retirement Plans Committee declined his appeal, Unisource and Georgia-Pacific would be instructed to issue payment of his Termination Benefit in the amount of $75,419.22. (IKCP 189, App. Ex. 3.)

65.     Paneccasio testified that he felt that the termination of the Plan should not apply to him because he opted to retire early under the early retirement window offered to him by Unisource. (Paneccasio Dep. 33:15-20, App. Ex. 4.)

66.     Paneccasio testified further that he relies on the 1991 Plan, the 1994 early retirement window, and the letter informing him of the termination of the Plan as the grounds for his assertion that he was misled into believing that the Plan could not be terminated as to him. (Paneccasio Dep., 33:15-34:12; 152:6-14, App. Ex. 4.)

**F.     Paneccasio's Charge of Age Discrimination**

67.     Paneccasio filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in July 2001, alleging that he was discriminated against on account of his age.  (Paneccasio Dep., 149:18-150:1, App. Ex. 4; PANE 1156-59, App. Ex. 2.)

68.     By notice dated August 9, 2001, the EEOC informed Paneccasio that his charge was dismissed because the facts alleged failed to state a claim under any of the statutes enforced by the EEOC and simultaneously notified him of his right to sue.  (App. Ex. 6.)

69.     All Plan participants who were similarly situated to Paneccasio were treated in exactly the same manner and in accordance with the terms of the Plan.  (Hope Decl. ¶ 21, App. Ex. 1.)

70.     The only support Paneccasio provides for his claim that he was discriminated against on account of his age is that the Plan was terminated a year before he turned age 65. (Paneccasio Dep. 138:22-140:14, App. Ex. 4.)

Respectfully submitted,

Kay Kyungsun Yu
Federal Bar No. ct13440
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4188 Telephone
(215) 689-4515 Facsimile

OF COUNSEL:

Joseph J. Costello
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5295

LOCAL COUNSEL:                         Robert L. Wyld
                                       Federal Bar No. ct04333
                                       Patrick M. Fahey
                                       Federal Bar No. ct13872
                                       Shipman & Goodwin
                                       One Constitution Plaza
                                       Hartford, Connecticut 06103
                                       (860) 251-5620/5824

## CERTIFICATE OF SERVICE

I, Kay Kyungsun Yu, hereby certify that on October 29, 2004, a true and correct copy of the foregoing IKON Defendants' Local Rule 56(a)(1) Statement was served via First-Class Mail upon the following:

Andrew B. Bowman, Esq.
1804 Post Road East
Westport, CT  06880

Rayne Rasty, Esq.
Georgia-Pacific Corporation
133 Peachtree Street NE
Atlanta, GA  30303-1847

Felix J. Springer, Esq.
Jennifer L. Sachs, Esq.
Day, Berry & Howard
CityPlace 1
Hartford, CT  06103-3499

Kay Kyungsun Yu