UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

EUGENE PANECCASIO,                      :

        Plaintiff,                       :

VS.                                     :  DOCKET NO: 3:01CV2065(CFD)

UNISOURCE WORLDWIDE, INC.,              :
GEORGIA-PACIFIC CORPORATION,
ALCO STANDARD CORPORATION
AND IKON OFFICE SOLUTIONS,              :
INC., ET AL

        Defendants          :  DECEMBER 26, 2004

**PLAINTIFF PANECCASIO'S OMNIBUS MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT[1]**

## I. The Legal Standard For Summary Judgment

For the following reasons, the motions for summary judgment filed in behalf of

the Unisource and IKON defendants should be denied.   In deciding a motion for

summary judgment, the Court must determine whether there is a genuine issue of

material fact, Anderson vs. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91

---

[1] The Unisource Defendants and IKON Defendants have submitted separate memoranda in support of
their motions for summary judgment.  For the sake of clarity and to avoid unnecessary duplication,
plaintiff is responding to each of the two motions for summary judgment in this omnibus response.

L.Ed.2d 202 (1986).  The Court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion for summary judgment which in this case is the plaintiff; Matsushita Elec. Indus. Co. vs. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  The non-moving party may defeat the summary judgment motion by producing sufficient facts to establish there is a genuine issue of material fact for trial; Celotex Corp. vs. Catrett, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The Second Circuit has followed the Supreme Court's standard by holding, "[w]hen viewing the evidence, the court must assess the record in a light most favorable to the non-movant and…draw all reasonable inferences in [the non-movant's] favor."  Weinstock vs. Columbia University, 224 F.3rd 33, 41 (2nd Cir. 2000) citing, Delaware & Hudson Railway Co. vs. Consolidated Rail Corp. 902 F.2d 174, 177 (2nd Cir. 1990).

## II.  Plaintiff's Age Discrimination Claims Are Sufficient To Withstand Summary Judgment

The Age Discrimination in Employment Act (ADEA) prohibits employers from discriminating against employees on account of age where the employee is a member of a protected age group; that is, over 40 years of age, see 29 U.S.C. §631(a). In order to establish a prima facie case of age discrimination, plaintiff must show that he was in

the protected age group; that he was qualified for the position; that he was discharged or suffered adverse employment action; and that adverse employment action occurred under circumstances giving rise to an inference of discrimination; <u>Norton vs. Sam's Club, et al</u>, 145 F.3[rd] 114, 118 (2nd Cir. 1998). "The burden of establishing a prima facie case is not onerous and has been frequently described as minimal", <u>Norton,</u> 145 F.3d at 118; <u>Scaria vs. Rubin</u>, 117 F.3[rd] 652, 654 (2nd Cir. 1997) (per curiam). Once plaintiff has established a prima facie case, defendant has the burden of producing "'reasons for its actions, which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action'". <u>Norton</u>, <u>supra</u>, 145 f.3[rd] at 118, quoting <u>Grady vs. Affiliated Cent, Inc.</u>, 130 F.3[rd] 553, 559 (2nd Cir. 1997) (quoting <u>St. Mary's Honor Ctr. vs. Hicks</u>, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d. 407 (1993). If the defendant meets its burden of producing an age-neutral reason for the discharge, the presumption of discrimination raised by the prima facie case 'drops out of the picture', <u>Grady</u>, 130 F.3[rd] at 559-60, see also <u>Fischer vs. Vassar College</u>, 114 F.3[rd] 1332, 1336 (2nd Cir. 1997) (in banc).

The burden then returns to the plaintiff who must adduce sufficient evidence to allow a rational fact finder to infer that the employer was motivated in whole or in part by age discrimination. <u>Norton</u>, 145 F.3[rd] at 118; <u>Fischer</u>, 114 F.3[rd] at 1336. The

plaintiff is entitled to rely "on the evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action." Fischer, 114 F.3rd at 1333.

Plaintiff is not required to produce direct evidence of discrimination. Norton, 145 F.3rd at 119; see, Luciano vs. Olsten Corp., 110 F.3rd 210, 215 (2nd Cir. 1997). Plaintiff's case may be entirely circumstantial. Id., see also Burger vs. New York Institute of Technology, 94 F.3rd 830, 833-35 (2nd Cir. 1986) finding a jury question in an age discrimination case based wholly on circumstantial evidence. Indeed, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since '[a]n employer who discriminates is unlikely to leave a 'smoking gun', such as a notation in an employee's personnel file, attesting to a discriminatory intent'". Rosen vs. Thornberg, 928 F.2d 528, 533 (2nd Cir. 1991). There will seldom be 'eyewitness' testimony as to the employer's mental processes.; Luciano, 110 F.3rd at 215, and the Second Circuit has rejected "the view that circumstantial evidence is inherently weaker than direct evidence", see, Norton, 145 F.3rd at 119; quoting United States vs. Sureff, 15 F.3rd 225, 229 (2nd Cir. 1994).

The Second Circuit has been clear in holding that "it is primarily the province of the jury to determine what inferences can be drawn from circumstantial evidence. So

long as the evidence can reasonably support an inference of discrimination, the court should not upset the jury's decision" and a fortiori should not deny the plaintiff the opportunity to present that evidence for a jury's determination. Norton, 145 F.3rd at 119; see, Gallagher vs. Delaney, 139 F.3rd 338 (1998).  The question is whether as a whole the evidence supports a sufficient rational inference.

In sum, in order to grant summary judgment not only must there be no genuine issue of material fact, but there must also be no controversy regarding the inferences to be drawn from them.  See, Donahue vs. Windsor Locks Bd. of Fire Comm'rs., 834 F.2d 54, 57 (2nd Cir. 1987).  In Gallo vs. Prudential Residential Servs., Ltd., Partnership, 22 F.3rd 1219, 1224 (2nd Cir. 1994) the Court of Appeals cautioned that summary judgment is a "drastic provisional remedy" where "intent is at issue".

### III.  Plaintiff Has Demonstrated a Sufficient Case of Discrimination Under The ADEA Entitling Him To Present His Claims To A Jury

ALCO and Unisource induced plaintiff to retire from his employment at age 57 in March 1994 by affirmatively representing to him that he would receive a monthly retirement benefit payment of $812.50 when plaintiff turned age 65 for a period of 120 months and would receive insured status under a life insurance policy with a cash value of $95,000 at age 65, of which he would be entitled to 65% or $61,750 and be

paid a lump sum death benefit equal to $375,000 of which he would be entitled to $243,750 upon his death.  (*Ex. 3, Pltf's Aff. par. 3)*.

In February 1994 ALCO Standard Corporation and Unisource Worldwide, Inc. jointly offered a program of early retirement to employees including those at Unisource Worldwide (*Ex. 3*)  (Your Personal Early Retirement Package) and specifically made an affirmative representation to plaintiff Paneccasio who was employed at a division of Unisource known as Rourke-Eno Paper Company (*Ex. 4)* that if he retired not later than March 31, 1994, he would receive certain rights under Deferred Compensation Plans including the 1980 and 1991 ALCO Standard Deferred Compensation Plans (*Ex. 3, 4, 5)*.

In 1994 William Bauer was Director of Risk Management at ALCO Standard from 1970 through 1997 (Ex. 1, *Bauer dep. pg. 6)*.  The Early Retirement Window Program was an attempt by Unisource to reduce expenses by making an offer to certain employees (*Ex. 1, Bauer dep. pg. 10)*.  Bauer testified at his deposition that the "retirement" had to do with attaining a certain age (*Ex. 1, Bauer dep. pg. 11)*.  In 1994 Bauer heard about the Early Retirement Window from Bill Kirby, a Vice President of HR at either ALCO or Unisource (*Ex. 1, Bauer dep. pg. 12)*.  Bauer's area of expertise

was benefits.  (*Ex. 1, Bauer dep. pg. 12-13)*.  Bauer was responsible for administering the 1991 Plan from 1991 through 1996 (*Ex. 1, Bauer dep. pg. 14)*.

Bauer drafted the Benefits portions of the Early Retirement Package (*Ex. 1, Bauer dep. pg. 19)*. The Early Retirement Package "herein after ERP" (*Ex. 3*) provided at pg. 2 that employees taking advantage of the ERP would receive "full vesting in your deferred compensation benefit payable at age 65 under the ALCO Standard Corporation 1980 and 1985 Deferred Compensation Plans – and partial vesting under the 1991 Deferred Compensation Plan. (*Ex. 3, pg. 2)*.  Under the heading "Making the Decision" the ERP states that Paneccasio must make his decision to retire by March 31, 1994 (*Ex. 3, pg. 3)*. On page 4 under the heading "What the Early Retirement Window Offers – A Comparison The Inducment Continues:  Special Early Retirement Window Benefits" "Deferred Compensation:  Full vesting in your benefits, if any, under the 1980 and 1985 AlCO programs; partial vesting in the 1991 ALCO program; benefit payable at age 65".  (*Ex. 3, pg. 4)*.

This "Special Early Retirement Window" benefits representation is different from and deliberately contrasted with the representation made in the adjacent column under the heading "Regular Early Retirement Benefits".  Under this "Regular" alternative, [not the Paneccasio election] it is provided, "Deferred Compensation: Vesting in your benefits, if any, under the 1980, 1985 or 1991 ALCO programs [is] **based on Plan participation at retirement"** (*Ex. 3, pg. 4*).  Here, ALCO and Unisource clearly represent that there is a difference in how deferred compensation would work.  If you took the "Special" ERP the representation is you're getting everything you bargained for.  If you don't, there is a caveat that vesting under the Deferred Compensation Plan is based "on plan participation at retirement".  Clearly, Unisource and ALCO were attempting to sell the "Special" ERP to Paneccasio by representing that if one took the "Special" ERP, which Paneccasio did, he would actually receive the benefits under the 1991 ALCO program.

Clearly, Unisource and ALCO Standard were doing everything possible to induce a belief by plaintiff that if he accepted the offer of the 1994 Early Retirement Package, he would receive greater benefits than if he retired later (*Ex. 3, pg. 4*).  The unconditional nature of the promise and the deception lies in the very wording of the ERP.  If Paneccasio accepted the "Early Retirement Window", he would "receive

greater benefits than [he] would if [he] retire[d] later" and specifically that, if he accepted the "Early Retirement Window," his "benefit" [under] the 1991 ALCO program would be "payable at age 65" as distinguished from "Regular Early Retirement Benefits" which were dependent on "[P]lan participation at the time of retirement" (*Ex. 3, pg. 4*).

The ERP further provided as follows:

**ALCO Standard Deferred Compensation Plans**:

> If you participate in the 1980 or 1985 ALCO Standard Corporation Deferred Compensation Plan, your benefits will become fully vested. Benefits in the 1991 Plan will become 65% vested if you elected the five year option (Paneccasio and 32.5% if you elected the ten year option. Under the 1991 Plan, you must continue to pay life insurance premiums to age 65.

> Your benefits under all of the Plan <u>will be paid to you monthly at age 65.</u> If you participate in any of these programs, see your personalized statement for the monthly benefit payable at age 65 under all of these programs. (*Ex. 3, pg. 8*).

The Personalized Look (*Ex 4*) referred to in *Ex. 3* gives specific numbers to Eugene Paneccasio as follows: "ALCO Standard Corporation Deferred Compensation Plan: your total vested monthly deferred compensation benefit under all plans in which you have participated, payable at age 65 for a specific period, is $3,836.50 [if which

$812.50 was the 1991 Plan] (*Ex. 4*).  On April 25, 1994 Bauer writes to Paneccasio (*Ex. 5*) advising him that "[b]y accepting the Unisource Early Retirement Window, you have retained the pre-age 65 life insurance benefit under the ALCO Standard 1991 Deferred Compensation Plan…Amount of life insurance coverage: $450,000; Quarterly premium charge: $231.75.  Depending on your age, the next insurance premium will increase by approximately 10% next year." (*Ex. 5*).  *With respect to Ex. 4*, "The Personal Look", Bauer had seen the format of the statement sent by Unisource to Eugene Paneccasio, and as the Director of Risk Management for ALCO Standard Corporation and Administrator of the 1991 Plan, he provided the information regarding the 1991 Deferred Compensation Plan, (*Ex. 1, pg. 22)*, and he authored the Benefits portion of the 1994 ERP (*Ex. 1, pg. 19, 22)*.  Therefore, ALCO Standard and Unisource were jointly involved in the representations made to Panecassio contained in *Exhibits 3,4 and 5* which are the ERP, The Personal Look and Bauer's letter with respect to life insurance.

Bauer testified that the purpose of providing The Personal Look *(Ex. 4)* to Panecassio was to provide "confirmation of what the Early Retirement Window – what benefits he would have been eligible for" (*Ex. 1, pg. 23)*.  It was to give the clearest

10

indication of what Paneccasio could expect to receive from Unisource if he took the Early Retirement Window in 1994. (*Bauer dep. pg. 23).*

Bauer testified that there was nothing in Exhibits 3, 4 and 5 that referred to the consequences of Plan termination (*Ex. 1, pg. 23-24).* Bauer was Director of Risk Management for ALCO Standard Corporation and was the individual providing the benefits information to Paneccasio in the ERP. (*Ex. 1, pg. 19).*

An examination of the ERP, The Personal Look and Bauer's letter of April 25, 1994 (*Ex. 3, 4, 5),* and the deposition testimony of the draftsman, William Bauer, leaves no doubt about the promise that was made to Eugene Paneccasio which induced him to give up his employment of 22½ years and his position as Vice President of Sales of National Accounts at Unisource and to retire at age 57. (*Pltf.'s Aff. par. 1-21).* Paneccasio gave up his employment, the prospects of future employment because of his age, another life insurance policy and relied completely upon the ERP, The Personal Look and the Bauer letter *(Ex. 3, 4, and 5)* in planning not only his retirement but also his pension election and the security for his wife in the event of his death (*Pltf's Aff. par.1-21, Ex. 4a).* He had no reason to believe that the representations he so reasonably relied upon would be rescinded or revoked by actions taken in 2000 by Unisource, Georgia Pacific and IKON. (*Pltf's. Aff. par. 1-21).*

**B. Deception By ALCO Standard and Unisource In The Early Retirement Plan Is Sufficient Evidence Under The McDonnell Douglas Pretext Analysis Or The Price Waterhouse Mixed Motive Analysis To Shift The Burden And To Create At Least A Genuine Issue Of Material Fact For Submission To A <u>Jury</u>**.

Deceiving a 57 year old employee regarding the consequences to him if he accepted the offer by Unisource and ALCO Standard of Early Retirement constitutes both direct and circumstantial evidence of age discrimination. Unisource's reliance on <u>Raskin vs. The Wyatt Co</u>., 125 F.3rd 55 (2nd Cir. 1997) is misplaced. First, <u>Raskin</u> was never eligible for the Early Retirement Plan and sought to use the existence of a plan as evidence of Wyatt's discriminatory animus. Here, Panceccasio not only was eligible for the ERP, but he relied upon specific representations as to the amount of money that would be paid to him at age 65 in the form of deferred compensation; $812.50 per month for 120 months or $97,500 and insured status under a life insurance policy with a cash value of $95,000 at age 65, of which he would be entitled to 65% or $61,750 and be entitled to a lump sum death benefit equal to $375,000 of which he would be entitled to $243,750 upon his death (*Ex. 3, Pltf's Aff. par. 1-21).*

Second, there was no claim in <u>Raskin</u> that the Wyatt Early Retirement Plan was deceptive or contained misrepresentations as to the consequences if a Wyatt

employee took early retirement.  Judge Jacobs was careful to note in <u>Raskin</u> that the ADEA creates a safe harbor for an employer's early retirement program only if it is a bona fide employment benefit plan.  The ADEA exempts only employee benefit plans that are "bona fide", <u>Raskin</u>, 125 F.3rd at 61-62.  Further, <u>Raskin</u> expressly recognizes that "the ADEA contemplates that a Plan and its terms might describe 'action otherwise prohibited under' the Act…" <u>Id</u>., 125 F.3rd at 62.

When an employer, in this case both Unisource and ALCO, see Bauer testimony, supra, misrepresent the consequences to an employee of his election to take early retirement under the ERP, that deception can never be countenance by the ADEA.  There is overwhelming evidence that Unisource and ALCO deceived Gene Paneccasio and induced him thereby into choosing to take early retirement.  Mr. Paneccasio's claim is that Unisource and ALCO discriminated against him on account of his age, because they deceived him and misrepresented consequences of his choice to participate in the ERP and thereby induced him into retiring from his employment of 22½ years and giving up his position as Vice President of Sales and National Accounts. Plaintiff's claim is that the ERP was a deception and a misrepresentation upon which Paneccasio reasonably relied and as a result changed his entire life including his employment and the security and the premises for the

security for himself and his wife in the future. This is not, as defendant's seek to mischaracterize plaintiff's claim, merely a claim that an Early Retirement Package is evidence of discrimination.

### IV. Joint Action By Unisource, ALCO, IKON and Georgia Pacific

ALCO Standard Corporation was a conglomerate for operating companies including Unisource Worldwide and ALCO Office Products (*Ex. 2, Hope dep. pg. 12-13*). Unisource was in the paper distribution business, and ALCO Office Products was in the copier and fax machine business (*Ex. 2, pg. 13-14*). Through 1996, Unisource was a wholly owned subsidiary of ALCO Standard Corporation. (*Ex. 2 pg.14*). In January 1, 1997, ALCO Standard split off from itself and Unisource Worldwide in a tax free distribution to shareholders (*Ex. 2, pg. 14*). ALCO Office Products and ALCO Standard then became a single entity, and on January 27, 1997 ALCO changed its name to IKON Office Solutions, Inc. (*Ex. 2, pg. 16*).

Defendant Walter J. Hope, Jr. became Administrator of the 1991 Plan in the last quarter of 1996 (*Ex. 2, pg. 18*). He succeeded Bauer as the Administrator, and prior to January 1997 "both had been on the corporate staff of ALCO Standard Corporation with Bauer being the Plan Administrator (*Ex. 2, pg.19-20*). Hope was the Administrator from January 1, 1997 through December 1, 2000 *(Ex. 2, pg. 20)*. Hope

reported to Michael Dillon, in the Controllers Office at ALCO Standard Corporation (*Ex. 2, pg. 21-22).*

Hope and Bauer remained in contact from January 1, 1997 through December 31, 2000 *(Ex. 2, pg. 36).*

Hope testified at his deposition that the Board of Directors at IKON terminated the 1991 Plan *(Ex. 2, pg. 43)*, and those discussions about termination took place during 1999 and 2000 (*Ex. 2, pg. 44).* Hope communicated with individuals at Georgia Pacific, the Senior Vice President of HR, Gary Melampy, counsel to Georgia Pacific and Georgia Pacific attorney Mary Hodgins regarding Plan termination. (*Ex. 2, pg. 52, Ex. 10-13).*

During calendar year 2000 Hope met with Georgia Pacific representatives in Atlanta (*Hope. dep. pg. 53).* The only reason articulated by the Board of Directors of IKON for their decision to terminate the 1991 Plan was "the Board of Directors articulated that there have been events that have occurred that had an adverse financial impact on IKON and as a consequence, the Board of Directors shows the termination of the Plan in accordance with the Plan's provisions to do so. (*Ex. 2, pg. 68).*  There was a Benefits Agreement between ALCO Standard and Unisource Worldwide articulating responsibilities of parties as respect benefit plans with regard to

the divestiture of Unisource Worldwide and how different Benefit and Welfare Plans would exist on a going-forward basis and which party would have responsibility for the various aspects of such benefits (*Ex. 2, pg. 70-71*).

Unisource became a wholly owned subsidiary of Georgia Pacific (*Ex. 2, pg. 71-72*).  According to Hope, IKON dealt with Unisource and Georgia Pacific in a fashion that was consistent with Unisource being a wholly owned subsidiary of Georgia Pacific Corporation (*Ex. 2, pg. 71-72, but see, Ex. 10-13*).

Hope had "numerous conversations between either himself or his staff and Bill Melampy at Georgia Pacific having to do with the mechanics of making sure Unisource individuals and various deferred compensation plans continued to receive the benefits to which they were entitled (*Ex. 2, pg. 73-74*). Melampy was Director of Compensation for Georgia Pacific (*Ex. 2, pg. 74*).  Hope was aware of the ERP that was offered to Paneccasio in 1994 (*Ex. 2, pg. 75),* even though it was prior to his tenure as Administrator.

Hope testified that the MetLife Insurance Policy insuring Eugene Paneccasio (*Ex. 9*) is evidence that Paneccasio's insurance policy still exists (*Ex. 2, pg. 92-95).* Hope, the Administrator of the 1991 Plan, testified that he had never seen anything

with regard to this particular ERP either with respect to Mr. Paneccasio or any other retiree prior to preparation in this litigation (Ex. 2, pg. 96-97).

Hope testified that Georgia Pacific, through attorney Mary Hodgins, ( *Ex. 10)* expressed Georgia Pacific's consent to the provisions related to plan termination with respect to the 1991 Plan and declared Georgia Pacific to be successor in interest to Unisource Worldwide, Inc. (*Ex. 2, pg. 103).*   The actions of the IKON Board came sometime after the March 13, 2000 letter (*Ex. 2, pg. 104).*   On June 21, 2000 Hope writes to Gary Melampy, chief counsel at Georgia Pacific Corporation advising that IKON is considering terminating the 1991 Plan (*Ex. 11).*   Hope also notes in his letter that a number of Unisource employees continue to be participants in the Plan (*Ex. 11).* The Board had not acted by the time Hope wrote *Ex. 11* to Melampy on June 21, 2000 (*Ex. 2, pg. 105-106).*

Paneccasio was not on a list of individuals to whom Unisource made commitments regarding the 1991 Plan, "because that offer to provide benefits under the 1991 Plan was made by ALCO Standard Corporation in the document you showed me earlier" (*Ex. 3, 4, 5)*; (*Ex. 2, pg. 108-109).*   Paneccasio was not on a list of individuals provided by Unisource in which he had committed to accelerated vesting of

17

the IKON Deferred Compensation Plan (*Ex. 2, pg. 108-109)*, (*Ex. 12, see Schedule A to Ex. 12).*

Then Georgia Pacific on June 23, 2000 represents to IKON in a letter from Melampy of GP to Hope at IKON that "Georgia Pacific/Unisource will not provide any affirmative statement, written communication or verbal opinion to our employees about your decision to terminate the Plan. " *(Ex. 13).* Georgia Pacific/Unisource worked hand in glove with IKON to facilitate not only Plan termination but also to keep the so-called reasons for such termination as close to their respective vests as possible. This was a joint effort at concealment by Georgia Pacific and IKON.  Hope refused to take responsibility for soliciting Georgia Pacific's agreement not to provide any affirmative statement regarding termination of the Plan by IKON (*Ex. 2, pg. 113-115).*

Finally, IKON remains the owner of the insurance policy for Paneccasio which is still in existence (*Ex. 9; Ex. 2, pg. 131).*  This insurance policy, as part of the Benefit Package Paneccasio received under the 1991 Plan is still in existence, even though the Plan was terminated as of December 31, 2000 (*Ex. 2, pg. 131*).  Both the Paneccasio and Callahan life insurance policies under the Plan are still in force (*Ex. 2, pg. 133-134).*

This was a cooperative effort between IKON and Georgia Pacific/Unisource during the year 2000, and Unisource simply cannot escape liability here, because it was complicit with IKON in breaking the promise previously made to Gene Paneccasio in 1994 which was a critical inducement to his decision to retire at age 57 after 23 ½ years from his position as Vice President of Sales and National Accounts. These corporations jointly participated in and facilitated the destruction of the security of Eugene Paneccasio who reasonably relied upon the affirmative representations made to him in 1994 by Unisource and ALCO Standard Corporation. When ALCO changed its name to IKON, it was a corporate "rose" by another name. Gene Paneccasio was the victim of age discrimination, because Unisource, ALCO Standard, Georgia Pacific and IKON deceived and misled him and thereby took advantage of him because of his age and solely because of his age thereby inducing him to retire. In doing so, they violated Paneccasio's rights under the Age Discrimination in Employment Act.

### V. The Equitable Tolling Doctrine Applies To Paneccasio's Age Discrimination Claim

Eugene Paneccasio filed his Affidavit of Discrimination with the EEOC in Boston, Massachusetts on July 18, 2001 (*Ex. 8*). Three hundred days prior to that date is September 22, 2000. The period from March 31, 1994 until December 31, 2000, the date the IKON Plan was terminated should be tolled, and the defendants

should be estopped from invoking an early date, in light of their fraudulent concealment of his cause of action during that period.

"The essence of the [equitable tolling] doctrine is that 'a statute of limitations does not run against a plaintiff who is unaware of his cause of action.'" Dillman vs. Combustion Engineering, Inc, 784 F.2d 57, 60 (2nd Cir. 1986) (quoting Cerbone vs. International Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2nd Cir. 1985)); see, This Court's Ruling in Paneccasio vs. Unisource Worldwide, Inc., 2003 WL 1714085, 30 Employee Benefits Cas. 1476 (D. Conn., Mar. 28, 2003). This Court has expressly noted in its earlier decision in this case, Id., 2003 WL 1714085 as follows:

> The Doctrine of Equitable Tolling "will be applied, for example, when an employer's misleading conduct is responsible for the employee's unawareness of his cause of action." Id. [Cerbone].

> "[E]quitable Tolling will defer the start of the EEOC filing from the time of the discriminatory action to the time the employee should have discovered the action's discriminatory nature." Id.

> Paneccasio's allegation that the defendants fraudulently concealed the facts that formed the basis of his age discrimination claim, which must be accepted as true for purposes of the motion to dismiss, states an adequate ground for equitable tolling.

20

Defendants claim that sometime around October 18, 2000 a letter was sent to Panceccasio advising of the prospective 1991 Plan termination as of December 31, 2000.  Although there was no reference to the promises made to Panceccasio in the ERP in that letter, there was no earlier date than some time after October 18, 2000 that Paneccasio could have ever known that the representations made to him in the 1994 ERP upon which he reasonably relied were deceptive and untrue.  (*Pltf's Aff. par. 13-21*). Therefore, Paneccasio filed within 300 days of the earliest date he could have possibly become aware that the representations in the ERP were untrue.  From March 31, 1994 until sometime after October 18, 2000, there was no way for Paneccasio to have discovered the secret discussions on going between and among Unisource, Georgia Pacific and IKON [ALCO's successor] in furtherance and in contemplation of the termination of the 1991 Plan.  Plaintiff was clearly misled into believing the unconditional promise that was made to him in the ERP, and he had no basis for disbelieving the promises made to him in 1994 until he received the letter sometime after October 18, 2000 advising him that the 1991 Plan was going to be terminated by IKON.  The doctrine of equitable tolling is clearly applicable to the facts of this case, and Eugene Paneccasio made a timely filing of his age discrimination claim with the EEOC in Boston on July 18, 2001.

The law is also clear that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitation is subject to waiver, estoppel, and equitable tolling. Zipes vs. Transworld Airlines, Inc., 455 U.S. 385 at 393, 102 S.Ct. 1127, 1132-33, 71 L.Ed.2d 234 (1982).

## VI.  Plaintiff Has A Valid Estopppel Claim Against The Defendants On Count VIII – The ERISA Count

There is sufficient evidence to proceed to trial on the Eighth Claim for Relief on equitable estoppel grounds.  As set forth in detail in Part IV above, Bauer, Director of Risk Management for ALCO Standard Corporation and Administrator of the 1991 Plan wrote the provisions of the 1994 ERP that were specifically represented to be benefits that would actually be paid at age 65 relating to Deferred Compensation in the 1991 ALCO program (*Ex. 3, pg. 3,4,8).*  Unisource, Georgia Pacific and IKON acting through Melampy and Hodgins for Georgia Pacific and Hope for IKON jointly executed the concealment of IKON's intentions to terminate the 1991 Plan during the years 1999 and 2000 (*Ex. 11-13).*

For the following reasons, neither Unisource, Georgia Pacific, nor the IKON defendants including ALCO Standard, IKON and its Board of Directors (or Walter Hope for concealment only) can escape liability for their respective roles in the

22

deception concealment and deprivation of benefits suffered by Eugene Paneccasio. The Second Circuit has recognized "a federal common law action for a suit by plan participants against a non-fiduciary who participates knowingly in a breach of fiduciary duty."   Lee vs. Burkhart, 91 F.2d 1004, 1008 (2nd Cir. 1993), and the implicit recognition of a cause of action for equitable or promissory estoppel under ERISA, see Lee vs. Burkhart, 91 F.2d at 1008; Chambless vs. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1039 (2nd Cir. 1985) cert denied., 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986).

"Under [Second Circuit] case law, promissory estoppel in ERISA cases requires satisfaction of four elements drawn from the state common law of promissory estoppel: (1) a promise; (2) reliance on the promise; (3) injury caused by the reliance; and (4) an injustice if the promise is not enforced."   Aramony vs. United Way Replacement Benefit Plan, 191 F.3rd 140, 151 (2nd Cir. 1999).

There are "extraordinary circumstances" in this case, because as the Court of Appeals held in Aramony, 191 F.3rd at 152 "extraordinary circumstances" requires a "remarkable consideration such as the **use of a promise of benefits to induce certain behavior on the employee's part**".   Moreover, as the Aramony Court observed at n.5, where a promise by an employer is used to induce the plaintiff to

retire, there is as a matter of law, "extraordinary circumstances" Id., 191 F.3rd at 152 n.5. The Aramony Court analyzed its prior decision in Schonholz vs. Long Island Jewish Med. Ctr., 87 F.3rd 72, 79 (2nd Cir.) cert denied, 519 U.S. 1008, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996) as implicitly finding 'extraordinary circumstances' "because the promise in that case, before being withdrawn, was used by the employer-defendant to induce the plaintiff to retire." Aramony, 191 F.3rd at 152, n.5.

The promise in plaintiff Paneccasio's case was made in 1994 in the ERP by the defendants Unisource and ALCO Standard Corporation to induce Eugene Paneccasio to retire; the promise was false and he reasonably relied on the promise. (*Pltf.'s Aff. par. 1-21).* Paneccasio was injured because of his reliance on the promise, and injustice will result unless the promise is enforced. There are clearly extraordinary circumstances present in this case within the meaning of Aramony and Schonholz under the law of the Second Circuit, and plaintiff has clearly established proof of a legally sufficient claim based on promissory and equitable estoppel. No case cited by the IKON defendants or the Unisource defendants stands for the proposition that Paneccasio may permissibly be denied the benefits promised to him in the ERP, upon which he reasonably relied, which induced him to retire and to structure his financial

security for the future based upon that inducement.  Deception was the hallmark of the defendants' conduct in this case.

IKON remains the owner of the insurance policy for Paneccasio which is still in existence (*Ex. 9; Ex. 2, pg. 131)*.  This insurance policy, as part of the Benefit Package Paneccasio received as a participant the 1991 Plan is still in force, even though the Plan was terminated as of December 31, 2000 (*Ex. 2, pg. 131*).  Both the Paneccasio and Callahan life insurance policies under the Plan are still in force (*Ex. 2, pg. 133-134).*  As part of the remedy sought by plaintiff, there should be equitable relief requiring IKON to restore the cash value of $61,750 and the paid up death benefit of $243,750 if, as Hope testified and as ex.9 indicates, the MetLife insurance policies for Paneccasio and Callahan are still in full force and effect.  Paneccasio has already reached the age of 65.

### VII.  IKON'S Deceptive Conduct And Lack of Responsibility Can Never Provide A Justifiable "Event" Permitting <u>Termination Under Paragraph 19 Of The 1991 Plan (Ex. 7)</u>

Notwithstanding the testimony of Walter Hope, the Plan Administrator and the <u>Holcomb</u> decision decided by a Vermont magistrate judge who was never presented with the following evidence of financial irresponsibility and improper conduct, IKON violated ERISA and has distorted a fair reading of the Plan by concealing from Plan

participants the true cause of the so-called "event" by which IKON seeks to justify the termination of the Plan.

The 1999 Annual Report of IKON Office Solutions (*Ex. 14*) states that on November 24, 1999 IKON reached a settlement in a series of class action complaints filed in the Eastern District of Pennsylvania on behalf of its shareholders. The plaintiffs alleged that during the period from January 24, 1996 to August 13, 1999 IKON and certain current and former principal officers and employee directors publicly disseminated false and misleading statements concerning IKON's revenue, profitability and financial condition in violation of federal securities law. As part of that settlement, IKON will pay $121.1 million dollars. Approval of the settlement was anticipated in February or March 2000. IKON states in its Annual Report that it believes that the settlement also resolves a purported class action claim pending in the federal court in Utah. That claim was brought under ERISA involving persons who participated in IKON's Retirement Savings Plan after January 1, 1994. Those allegations mirror the allegations made in the complaints filed in the Eastern District of Pennsylvania. IKON recorded a charge of $101.1 million dollars in fiscal 1999 relating to the settlement computed as follows: $111 million as the settlement plus $10.1 million for legal fees offset by $20 million dollars of insurance proceeds. (*Ex. 14*).

IKON's claim that it was terminating the 1991 Plan, because it had an adverse financial impact on IKON is hollow. What really happened was that IKON engaged in false and misleading practices aimed at deceiving the public and violating securities laws. As a result, it was caught and was compelled to pay $111 million dollars in damages and $10.1 million dollars in legal fees for a total of $121 million dollars that was a result of its own misconduct.

It wasn't the Plan that was having an adverse impact on IKON; it was IKON's own misconduct, and the Board of Directors sought to punish participants in the 1991 Plan in order to obtain revenues to cover the cost of its own deceptive and misleading conduct. This should never be permitted at the expense of plaintiff Paneccasio. There is no indication in the <u>Holcomb</u> decision in Vermont that the magistrate judge was aware of IKON's misconduct. Further, <u>Holcomb</u> does not deal in any way with the claims being made here by Eugene Penaccasio under the 1994 Early Retirement Package.

Finally, no deference should be given to IKON's decision to deny benefits to Paneccasio under a claimed Top hat Plan, since the proper standard for review of IKON's decision is <u>de novo</u>; see <u>Goldstein vs. Johnson & Johnson,</u> 251 F3d. 433, 443-

44 (3d Cir. 2001); see also <u>Gallione vs Flaherty,</u> 70 F3d. 724, 729 (2nd Cir. 1995)(an open question in the Second Circuit)[2].

For all these reasons, the Motions for Summary Judgment filed by the Unisource and IKON defendants must be denied.

THE PLAINTIFF,
EUGENE PANECCASIO

BY_____
    ANDREW B. BOWMAN
    Federal Bar No: ct00122
    1804 Post Road East
    Westport, CT 06880
    (203) 259-0599
    (203) 255-2570 (Fax)

---

[2] Although this court has previously dismissed plaintiff's state law claims under the doctrine of ERISA preemption, in view of the Second Circuit's recognition in Gallione, 70 F. 3d at 729 that the special nature of top hat plans means that some state law claims might not be preempted by ERISA, we ask the Court to reconsider its previous decision to dismiss the state law claims and to reinstate them to this case.

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was mailed, postage prepaid, on this _____ day of December, 2004 to:

Felix J. Springer
Jennifer L. Sachs
Day, Berry & Howard
CityPlace 1
Hartford, CT 06103-3499


Kay Kyungsun Yu, Esq.
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103


_____
ANDREW B. BOWMAN