## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EUGENE PANECCASIO, | : | |
|        Plaintiff | : | Civil Action No. 3:01 CV 2065(CFD) |
| | : | |
| v. | : | |
| | : | |
| UNISOURCE WORLDWIDE, INC., et. al., | : | |
|        Defendants. | : | |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Eugene Paneccasio brought this action against defendants Unisource Worldwide, Inc.

("Unisource"), Georgia-Pacific Corporation ("Georgia-Pacific"), Alco Standard Corporation

("Alco"), IKON Office Solutions, Inc. ("IKON"), IKON's Board of Directors (individually and

as fiduciaries) ("Board"), and W. J. Hope Jr. (individually and as administrator and fiduciary of

the 1991 IKON Office Solutions, Inc. Deferred Compensation Plan).[1]  The two claims that

remain after a previous ruling by this Court on the defendants' motions to dismiss,[2] assert

---

[1]Unisource and Georgia-Pacific are jointly represented and collectively referred to here as the "Unisource Defendants."  Alco, IKON, the Board, and W. J. Hope, Jr. are jointly represented and collectively referred to here as the "IKON Defendants."  The Unisource Defendants and the IKON Defendants have filed separate motions for summary judgment.

[2]In a prior ruling, the Court dismissed Paneccasio's state law causes of action, including his contract claim, because they were preempted by ERISA.  Paneccasio v. Unisource Worldwide, Inc., 2003 U.S. Dist. LEXIS 4757 at **14-25.  The Court finds in this ruling that the Plan is a top hat plan and exempt from some of ERISA's central provisions.  That exemption, however, does not subject the top hat plan to state common law causes of action.  Top hat plans remain subject to other ERISA provisions including its reporting and disclosure provisions, and its administration and enforcement provisions.  See Demery v. Extebank, 216 F.3d 283, 287 (2d Cir. 2000).  While the Second Circuit has not directly reached the issue, see id.; Gallione v. Flaherty, 70 F.3d 724, 727 (2d Cir. 1995), at least one other circuit has determined that top hat plans are subject to federal common law causes of action.  See, e.g., Kemmerer v. ICI Americas, 70 F.3d 281 (3d Cir. 1995) (challenges to top hat plans fall within the civil enforcement provisions of ERISA but federal common law applies).  Paneccasio has not argued that his

violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et. seq.*, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*  Before the Court are two motions by the defendants for summary judgment.  For the following reasons, both motions are granted.

I.    **Background**[3]

Eugene Paneccasio was hired by a division of Unisource in 1971.  Unisource is a national supplier of office products and related equipment.  By 1994, Paneccasio was a vice president of sales and national accounts.  At that time, Unisource was a wholly owned subsidiary of Alco.  In 1990, Paneccasio had elected to participate in a new deferred compensation plan called the "Alco Standard Corporation 1991 Deferred Compensation Plan" (the "Plan") offered to employees of Alco and some of its subsidiary companies, including Unisource.  The Plan, which is commonly referred to as a "top hat" plan, was available to employees who earned at least $100,000 per year and offered benefits in addition to other retirement benefits provided by Unisource.   The Plan allowed participants to defer a portion of their compensation until retirement.[4]  Eligible

---

contract claim should be subject to federal common law, but asks for reconsideration of the dismissal of the state law claims.  Just as in Demery and Gallione, however, whether state contract law or an emerging federal common law doctrine would survive ERISA preemption of top hat plans, no breach of contract occurred in this case.  The Court therefore does not – and need not – address the potential cause of action in federal common law for breach of a top hat plan and does not need to reconsider its prior decision on the motion to dismiss concerning preemption of state law causes of action.

[3]The following information is taken from the parties' Loc. Civ. R. Pro. 56(a)(1) and (2) statements of undisputed facts.  It is undisputed unless otherwise indicated.

[4]The Plan also allowed employees to purchase life insurance based on a "split-dollar" arrangement with Alco.   The "split-dollar" arrangement was that the participating employee and

employees could select among three options under the Plan.  Paneccasio selected Option II, which provided that when he retired and reached age 65 he would receive benefits in the amount of $15,000 per year for ten years, and a $95,000 cash value life insurance policy with a paid-up death benefit of $375,000.

The Plan provided that an employee who terminated employment before "vesting" would no longer be allowed to participate in the Plan, and would receive his prior contributions[5] without interest at the time his employment ended.  Vesting typically occurred ten years after the employee began his participation in the Plan.  Another provision permitted termination of the Plan at the sole discretion of Alco's Board of Directors.[6]  Upon termination of the Plan, a

_____

Alco agreed to "split the benefits associated with the life insurance policies, as well as the costs of such benefits.  Life insurance will be owned by Alco until the later of 1) the date [the employee] retires, or 2) the date [the employee] attain[s] age 65."

[5] "Contributions," as used in this opinion, means the deferred compensation or "deferrals" that the employee directed to the Plan.

[6] Paragraph 19 of the Plan provided that:
Termination.  The Board of Directors of Alco shall have the right to terminate the Plan in its entirety and not in part at any time it determines that proposed or pending tax law changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact on Alco.  In such an event, Alco shall have no liability or obligation under the Plan or the Participant's Participation Agreement (or any other document), provided that 1) Alco distributes, in lump sum, to any Participant whose benefit payments have not commenced, the value of the amount of the Participant's deferrals to the date of termination plus interest (compounded annually) at a rate of 6% per annum; and 2) Alco distributes, in a lump sum, to any Participant whose benefit payments have commenced, all amounts thereafter due, in any amount as calculated in accordance with Paragraph 19, "Acceleration of Benefits."  Such lump-sum distribution, at Alco's election, may be made in the form of cash, or life insurance, or both.

participating employee who had vested but who had not retired would receive a lump sum payment of the amount of his prior contributions to the Plan plus interest. An employee who had retired before the Plan was terminated would receive a lump sum of the future payments due him.

In 1994, Unisource offered Paneccasio an Early Retirement Package ("ERP"). Paneccasio, who was 57 years old at the time, accepted, and retired as of April 1, 1994. The ERP was described in a brochure provided to Paneccasio entitled, "Your Personal Early Retirement Package: A Window of Opportunity." The ERP included a one-time cash bonus of up to $7500, full vesting in the company retirement package (which was different from the Plan), continued medical coverage until age 65, and term life insurance paid by Unisource. Participants in the ERP also received an early vesting benefit in the Plan.[7] Having elected to participate in the ERP, Paneccasio retired in 1994.

In 1997, Alco changed its name to IKON, and spun off Unisource as an independent entity. In 1999, Georgia-Pacific acquired Unisource. During all times after Paneccasio left Unisource, IKON retained control over the Plan.

In 2000, the IKON Board of Directors terminated the Plan. According to the testimony of W.J. Hope, the Plan administrator, the Plan was terminated by the IKON Board because of the unfavorable interest rates at the time and declining participation. Hope also testified that he first recommended the Plan termination to the IKON Board at some point in 2000. Paneccasio and other plan participants were notified in October 2000 of the pending termination, which was to become effective on December 31 of that year. Paneccasio had not begun to receive benefit

---

[7]At the time of his early retirement, Paneccasio had not vested in the Plan as he had only been enrolled in it for about four years. The ERP provided for 65% vesting in the Plan.

payments at that time, because he had not reached the retirement age of 65. As a result, he received a lump sum termination benefit of $75,419.22, which was comprised of his contributions and interest. Paneccasio sent IKON a letter on November 10, 2000 stating that because he was 65% vested in the Plan under the ERP, he believed he was entitled to additional benefits beyond the termination benefit. IKON, through the Plan Administrator W.J. Hope, Jr., responded on November 30, 2000 and stated that although Paneccasio was vested in the Plan, he was not due additional payments such as payment of future benefits.

On December 15, 2000, Paneccasio, through counsel, wrote to Hope indicating his intent to appeal what he considered to be a denial of benefits under the Plan. On January 24, 2001, Hope informed Paneccasio that he had the right to request an appeal with the Retirement Plans Committee. On March 8, 2001, Paneccasio appealed the Plan Administrator's denial of benefits, but on July 3, 2001, Paneccasio was informed that his appeal was denied. On July 12, 2001, Hope informed Paneccasio that he would be issued his Termination Benefit of $75,419.22.

In July 2001, Paneccasio filed an age discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC"). Through an August 9, 2001 notice, Paneccasio was informed that his charge was dismissed for failure to state a claim under the statutes enforced by the EEOC. He was also notified of his right to sue, and subsequently filed this lawsuit in November 2001. As mentioned previously, the remaining counts of Paneccasio's complaint are based on the ADEA and ERISA.

## II.     Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there

are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56;  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).   The burden of showing that no genuine factual dispute exists rests upon the moving party.  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton, 202 F.3d at 134.  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

**III.    Age Discrimination**

Paneccasio argues that he was wrongfully induced by all of the defendants to take early retirement.  Doing so, he argues, was to his financial detriment and was a product of discrimination against him on the basis of his age.  The Unisource Defendants and the IKON Defendants have moved separately for summary judgment on Paneccasio's age claim, but share

the same arguments.  They argue that: (1) Paneccasio's EEOC filing was untimely; (2) that neither Georgia-Pacific nor the IKON Defendants was Paneccasio's employer under the provisions of the ADEA; (3) that Paneccasio cannot establish a prima facie case of age discrimination; and (4) that even if Paneccasio has established a prima facie case of age discrimination, they have presented sufficient non-discriminatory reasons to avoid liability under the ADEA.

### A.     Paneccasio's EEOC Charge and Equitable Tolling

Paneccasio's EEOC charge was filed on July 18, 2001.  He retired on April 1, 1994.

An individual who wishes to file a private action for violation of the ADEA must generally first file a charge with the EEOC within 180 days of the unlawful employment practice. 29 U.S.C. § 626(d)(1).  A charge may be brought within 300 days if the alleged discrimination occurred in a state or locality that has its own anti-discrimination laws and enforcement agency. 29 U.S.C. §§ 626(d)(2), 633(b).  Holowecki v. Fed. Express Corp., 440 F.3d 558, 562 (2d Cir. 2006).  In its prior ruling in this case, this Court determined that Paneccasio was required to file his claim with the EEOC within 300 days of the alleged unlawful employment practice. Paneccasio v. Unisource Worldwide, Inc., 2003 U.S. Dist. LEXIS 4757, *9 (D. Conn. Mar. 28, 2003).   Paneccasio argues that the period between his early retirement date of April 1, 1994 and December 31, 2000, when the Plan was terminated, should be tolled.[8]  Paneccasio argues that the period should be equitably tolled because of the defendants' "fraudulent concealment of his

---

[8]Paneccasio does not argue that the alleged unlawful employment action occurred on the date of the termination of the Plan, December 31, 2000.

cause of action during that period."

As discussed in the prior ruling in this case,

> "The essence of the [equitable tolling] doctrine 'is that a statute of
> limitations does not run against a plaintiff who is unaware of his cause of action.'"
> Dillman v. Combustion Eng'g. Inc., 784 F.2d 57, 60 (2d Cir. 1986) (quoting
> Cerbone v. International Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d
> Cir.1985)). The doctrine of equitable tolling "will be applied, for example, when
> an employer's misleading conduct is responsible for the employee's unawareness
> of his cause of action." Id. "Equitable tolling will defer the start of the EEOC
> filing period from the time of the discriminatory action to the time the employee
> should have discovered the action's discriminatory nature." Id.

Paneccasio v. Unisource Worldwide, Inc., 2003 U.S. Dist. LEXIS 4757 at *9.  "To invoke

equitable estoppel, a plaintiff must show that: (1) the defendant made a definite

misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the

plaintiff reasonably relied on that misrepresentation to his detriment." Buttry v. General Signal

Corp., 68 F.3d 1488, 1493 (2d Cir. 1995).  "The relevant question is not the intention underlying

defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have

been aware of the existence of a cause of action." Veltri v. Bldg. Serv. 32b-J Pension Fund, 393

F.3d 318, 323 (2d Cir. 2004).  The question then, is whether there is a genuine issue of material

fact as to whether the defendants made misrepresentations which induced Paneccasio's

participation in the ERP.

Paneccasio summarized his position at his deposition,

> The misrepresentations that I am claiming made to me was a promise that
> was made to me in 1994 that I will receive these benefits as stated in the early
> retirement package and statement that when I reached age 65, I would receive
> these benefits, and the benefits were accordingly written to me and stated as such;
> and in the year 2000, when I received the letter from Ikon telling me that they
> were terminating the plan, I felt that they reneged on a promise that was made to
> me in 1994 and which I relied on specifically took an early retirement based on

-8-

my age, based on what was presented to me, and they just did not come through and reneged on the promise that was made to me back then.

Boiling down his claim, Paneccasio asserts that the misrepresentation was that he would receive his post age 65 benefits even if the Plan had been terminated, and relies on statements set forth in the ERP brochure he received in 1994.  He first points to the statement that, "If you retire under this special Early Retirement window, you will receive greater benefits than you would if you retire later."[9]  However, that brochure also contained a disclaimer, written in bold type and presented in a highlighted box, stating that "the benefits described in this brochure are only summaries of the Early Retirement window's major provisions. . . . In case of any dispute, the official legal documents or contracts will govern over this brochure."  The Plan clearly delineated the early termination provision in its paragraph 19.

Paneccasio points to other claimed misrepresentations in the ERP brochure that compared the benefits in boxes denominated "regular early retirement benefits," "regular retirement benefits," and the "special early retirement benefits" he accepted.  However, even those comparisons only indicated that the new benefit he would receive as to the Plan was early vesting, not a guaranty that benefits would be available for him after age 65.  There is no language that the termination provision of the Plan was affected in any way.[10]  Finally, although

---

[9]There is no dispute that Paneccasio received some benefits under the ERP that he was not otherwise entitled to, such as the early vesting in the Plan and the cash bonus.

[10]Both the boxes for regular early retirement and special early retirement stated that the benefit was "*payable* at age 65," thus suggesting full benefits payments after age 65 were not a certainty and also not contradicting the termination provision of the Plan.  Paneccasio points out that the box for regular early retirement contains the language "vesting [is]  . . . based on plan participation at retirement," while that language is absent from the box for the ERP.  He argues that the absence of this language indicates that the ERP program did not require Plan participation at age 65 and thus even if the Plan had been terminated, that was tantamount to a

page eight of the brochure states, in part, that, "Your benefit(s) under all of the [deferred compensation] Plans will be paid to you monthly at age 65," that is also not enough to constitute a misrepresentation overriding the termination provision in the Plan in light of the clear indications throughout the brochure that the only new benefit under the ERP concerning deferred compensation was early vesting, as well as the disclaimer at the end of the brochure.[11]

These undisputed facts are particularly relevant to Paneccasio's claim of equitable tolling. There has been no evidence presented which shows that any of the defendants misrepresented the continued validity of the termination provision of the Plan at the time Paneccasio considered and agreed to the ERP, that the defendants then intended at some later date to terminate the plan, or that the defendants acted jointly then or at any time with the intent to conceal the continued viability of the termination provision or to terminate the Plan.

There is no evidence upon which the Court can conclude that Paneccasio should benefit from the doctrine of equitable tolling. Therefore, the Court finds that Paneccasio's EEOC filing

---

guaranty of the post age 65 benefits. He is correct in the sense that under regular early retirement, whether one would receive the enhanced post age 65 benefits depended on whether the employee had vested by the time of early retirement, not whether he was a "participant" in the plan at the time of early retirement. However, that term – "participation" – concerns the situation of the employee at the time of *early* retirement, not the regular retirement age of 65. It also deals only with vesting, not the issue of Plan termination, and is followed by the phrase "benefit *payable* at age 65," as noted above. Finally, even the use of the word "participation" is incorrect because the level of participation was relevant at the time of regular early retirement because if one had participated for ten years, he would have vested. Thus, the absence of this language in the special early retirement box was not misleading when read closely.

[11]Paneccasio also points to a statement from Unisource which accompanied the brochure and estimated benefits for him if he chose to participate in the ERP. It indicated the amount he would receive under the Plan (including the other deferred compensation plans he participated in) after the vesting benefit. However, that summary also restates "*payable* at age 65," does not override the Plan's termination provision, and advises to "carefully read the descriptive brochure."

was untimely.  Because Paneccasio's EEOC charge was not filed within 300 days of the allegedly

unlawful employment practice, his ADEA claim is not properly before this Court.   Defendants'

motions for summary judgment are therefore granted as to Paneccasio's ADEA claim as to all

defendants.


###### B.     Prima Facie Case of Age Discrimination

Regardless of the timeliness of the EEOC filing, Paneccasio's prima facie case of age

discrimination does not survive summary judgment review.  A prima facie case of age

discrimination must satisfy the same test as discrimination allegations under Title VII, 42 U.S.C.

§§ 2000 et. seq.  Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001).   The analytical

framework for addressing discrimination under Title VII is set out in McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973).

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of

establishing a prima facie case of discrimination.  To do so, a claimant must show that: 1) he

belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse

employment action; and 4) the adverse employment action occurred under circumstances giving

rise to an inference of discriminatory intent.  See id.; see also Terry v. Ashcroft, 336 F.3d 128,

138 (2d Cir. 2003).  If the plaintiff satisfies these requirements, the burden then shifts to the

defendant to offer a legitimate, non-discriminatory rationale for its actions.  McDonnell Douglas,

411 U.S. at 802.

Once the defendant demonstrates a non-discriminatory reason for its decision, the burden

again shifts to the plaintiff, who now must show that the defendant's proffered reason is a mere

pretext for discrimination.  See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000),

cert. denied, 540 U.S. 811 (2003).  To survive summary judgment, the plaintiff must "produce

not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the

legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more

likely than not [discrimination] was the real reason for the [employment action].'"  Van Zant v.

KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (quoting Woroski v. Nashua Corp.,

31 F.3d 105, 110 (2d Cir. 1994)). The McDonnell Douglas burden-shifting framework is only

necessary when the plaintiff has failed to offer direct evidence of discriminatory intent.  See

Swierkiewicz v. Sorema, 534 U.S. 506 (2002) ("If a plaintiff is able to produce direct evidence of

discrimination, he may prevail without proving all the elements of a prima facie case.") (citing

Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985));  Johnson v. New York, 49 F.3d 75,

78 (2d Cir. 1995) ("The McDonnell Douglas framework, which guided the district court's

analysis, is intended to assist the fact-finding process when the plaintiff is unable to present

direct evidence of discrimination.").   Here, Paneccasio has not offered any direct evidence of

discriminatory intent; therefore, the McDonnell Douglas inquiry is appropriate.

    It should be noted at the outset of this inquiry that "a plaintiff's burden of establishing a

prima facie case in the context of employment discrimination law is 'minimal.'" Collins v. New

York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002) (quoting McGuinness v. Lincoln Hall,

263 F.3d 49, 52 (2d Cir. 2001). "Since the court, in deciding a motion for summary judgment, is

not to resolve issues of fact, its determination of whether the circumstances 'give rise to an

inference' of discrimination must be a determination of whether the proffered admissible

evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer

a discriminatory motive." <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 38 (2d Cir. 1994).

Paneccasio fails to meet his initial burden of establishing a prima facie case of age discrimination. Even if he could establish a valid prima facie case, the defendants present legitimate non-discriminatory reasons for terminating the Plan, and there are no genuine material issues of fact that these reasons were not pretextual.

As to the first element of Paneccasio's prima facie case, Paneccasio was older than forty when he accepted the ERP, and was therefore a member of the ADEA's protected class. 29 U.S.C. § 631(a). As to the second element, it is undisputed that Paneccasio was at least 'minimally' qualified for his position at Unisource. Establishing qualification for a position is not an onerous burden. <u>See</u> <u>Gregory v. Daly</u>, 243 F.3d 687, 696 (2d Cir. 2001) (holding that a plaintiff must establish that he or she possesses the basic life skills necessary to perform the job, and that such an inference can easily be drawn from a case in which the employee had already held the job). An inference that Paneccasio was qualified for the position can be drawn particularly because he could have opted to remain in his position instead of electing to retire early. As to the third element, the Court concludes that there is no genuine issue of material fact that Paneccasio was not subject to an adverse employment action because he was not an employee at the time when the Plan was terminated. However, even if Paneccasio did experience an adverse employment action, there is insufficient evidence to lead a rational fact-finder to reasonably draw an inference of discriminatory intent, the final factor of the prima facie case. For example, Paneccasio does not offer any evidence or argument addressing the fact that the Plan's termination affected all of its participants, regardless of age. <u>See</u>, <u>e.g.</u>, <u>Devlin v. Transportation Communications International Union</u>, 175 F.3d 121, 127-28 (2d Cir. 1998). Nor

has Paneccasio offered any evidence that the ERP violated the ADEA if that is to be the "adverse employment action" about which he complains. Voluntary early retirement plans are expressly permitted by the ADEA, and there has been no showing here that the particular circumstances of the ERP raise an inference of discrimination or arbitrarily discriminated on the basis of age. See Auerbach v. Board of Educ., 136 F.3d 104 (2d Cir. 1998). There are no genuine issues of material fact that Paneccasio cannot, as a matter of law, assert a prima facie case of age discrimination.

Even if Paneccasio had asserted a valid prima facie case, the Unisource and IKON Defendants argue that it is undisputed that the Plan was terminated for a legitimate non-discriminatory reason. Specifically, they argue that the Plan was terminated because of unfavorable interest rates and lower than anticipated participation, and thus was no longer financially prudent for IKON to maintain it. Paneccasio asserts that this rationale is pretextual, and goes so far as to argue that the defendants engaged in deception in order to induce his early retirement before the termination of the Plan. He does not explain what circumstances existed or provide evidence about the pretext.[12]   Therefore, there is no issue of material fact that the

---

[12]Paneccasio may be arguing that it was Unisource's intent at the time of the ERP to encourage participation in it, misrepresent whether termination of the Plan was still possible, and then terminate the Plan. However, there has been no evidence presented that Unisource intended to terminate the Plan at the time of the ERP. Paneccasio also provides the following argument as to his ERISA claim: that based on IKON's annual reports the true explanation for the termination of the Plan was not the stated reasons but rather the settlement of a shareholder class action alleging violations of securities laws in which IKON paid approximately $121.1 million. (Plaintiff's Brief, p. 27). Even if Paneccasio asserted this as a "pretext" argument for the ADEA claim, the Court concludes that he does not offer sufficient evidence that raises a material issue of fact as to the existence of pretext; the settlement could be argued as pretext for IKON's decision to terminate the plan because of these financial reasons rather than the ones stated by Hope, but does not indicate that it is pretext for *employment discrimination*. Indeed, as the Supreme Court explained in McDonnell Douglas, the purpose of the pretext analysis is to ensure

legitimate non-discriminatory reason asserted by the defendants is not pretext.

Summary judgment is therefore granted to the defendants on Paneccasio's ADEA claim.[13]

## IV.     ERISA and  Equitable Estoppel

Count eight of Paneccasio's complaint alleges that the Plan is subject to ERISA, that the defendants breached their fiduciary and non-fiduciary duties owed to him when they terminated it, and that because he relied on their representations in the ERP about future benefits, the defendants should be estopped from denying their liability.   The defendants make a number of arguments in favor of summary judgment on this claim.  The Unisource Defendants argue that they are not appropriate defendants under any of the relevant civil enforcement provisions contained in ERISA § 502(a).  29 U.S.C. § 1132(a).  The Unisource Defendants also argue that even if the Court finds that they are proper defendants under ERISA, there was no violation of ERISA.  Finally, the Unisource Defendants argue that there is no evidence to support Paneccasio's equitable estoppel claim under ERISA.  The IKON Defendants likewise seek summary judgment as to Paneccasio's ERISA claims on the basis that the termination of the Plan and payment of the termination benefit was neither arbitrary nor capricious, that there is no genuine issue of material fact whether he received all that he was owed when he was paid his termination benefit, and that there is no breach of fiduciary duty claim.  Finally, the IKON

_____

that the plaintiff is "given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a . . . discriminatory decision."  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 805 (1973).

[13]Because the Court concludes that Paneccasio's EEOC filing was untimely and that even if it was timely, his prima facie case of age discrimination fails, the defendants' argument that Georgia-Pacific and IKON were not employers of Paneccasio need not be addressed.

Defendants join the Unisource Defendants in their argument that Paneccasio does not state an

equitable estoppel claim under ERISA.   These arguments will be addressed below.


### A.      ERISA Claim as to the Unisource Defendants

As an initial matter, while top hat plans are treated differently from qualified plans in

some respects, courts have interpreted ERISA to cover top hat plans in a number of respects:

> Top hat plans are exempt from many provisions of ERISA, including the
> participation and vesting, funding, and fiduciary responsibility requirements, see
> 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1), but like qualified plans, they are
> subject to disclosure requirements, to civil enforcement, and to the duty to have a
> claims procedure, see 29 U.S.C. §§ 1021, 1132, 1133.

Eastman Kodak Co. v. STWB, Inc., 2006 U.S. App. LEXIS 16079 (2d Cir. 2006); see also

Cogan et al v. Phoenix Life Insurance Co., 310 F.3d 238, 242 (1st Cir. 2002) (holding that ERISA

applies to claims of breached top hat plans); Kemmerer v. ICI Americas Inc., 70 F.3d 281, 286-

87 (3rd Cir. 1995)("despite the exemption of top hat plans from many of ERISA's regulations,

ERISA's enforcement provision clearly permits participants in top hat plans, as well as other

covered plans, to bring civil actions to enforce the substantive provisions of the Act or to recover

benefits due or otherwise enforce the terms of the plan.")(internal citations omitted).

 The civil enforcement provisions contained in ERISA § 502(a), 29 U.S.C. § 1132(a), are

the exclusive remedies available for violations of that statute.  The Supreme Court has expressed

"unwillingness to infer causes of action in the ERISA context, since that statute's carefully

crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend

to authorize other remedies that it simply forgot to incorporate expressly.'"  Mertens v. Hewitt

Assoc., 508 U.S. 248, 254 (1994), quoting Mass. Mut. Life Ins. v. Russell, 473 U.S. 134, 146-47

(1985)(emphasis in original).  Under ERISA § 502(a), civil actions may be brought by plan

participants or beneficiaries, fiduciaries, or the Secretary of Labor.  29 U.S.C. § 1132(a). Civil

suits by plan participants may be brought under §§ 502(a)(1), (2), or (3).  29 U.S.C. §§

1132(a)(1), (a)(2), or (a)(3).  The Unisource Defendants argue that Paneccasio has not stated an

ERISA claim under any of these provisions.

     Section 502(a)(1) allows ERISA plan participants "to recover benefits due . . . under the

terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future

benefits under the terms of the plan."  29 U.S.C. § 502(a)(1)(B).  The Second Circuit has

indicated that:

> [S]everal times in prior opinions we have indicated that a plan is a proper
> defendant in an action to recover benefits under § 1132(a)(1)(B). "In a recovery of
> benefits claim, only the plan and the administrators and trustees of the plan in
> their capacity as such may be held liable."

 Chapman v. Choicecare Long Island Term Disability Plan, 2002 U.S. App. LEXIS 24460, *7

(2d Cir. 2002), quoting Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1199 (2d Cir. 1989) (citing

29 U.S.C. §§ 1132(d)(2)).  There is no dispute that the Unisource Defendants do not include the

Plan, its administrators or trustees.  Therefore, Paneccasio's claim cannot be maintained against

the Unisource Defendants under § 502(a)(1).

     Section 502(a)(2) allows a participant to bring a civil action under ERISA § 409.  In

relevant part, § 409 provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this title shall
> be personally liable to make good to such plan any losses to the plan resulting
> from each such breach, and to restore to such plan any profits of such fiduciary
> which have been made through use of assets of the plan by the fiduciary, and shall
> be subject to such other equitable or remedial relief as the court may deem

-17-

appropriate, including removal of such fiduciary. . . .

29 U.S.C. § 1109(a) (emphasis added).  Because Paneccasio brings this civil suit on his own

behalf – not on behalf of the plan – § 502(a)(2) also is not an appropriate avenue of relief against

the Unisource Defendants.  See, e.g., Russell, 473 U.S. at 140 (holding that a fiduciary's liability

is to the plan, not to the individual plan participants).

Even if Paneccasio's claim could be brought under § 502(a)(2), there is no dispute that

the Plan was a "top hat" plan.  "[S]uch a plan [is] excluded from ERISA's vesting, funding, and

fiduciary responsibility requirements because Congress deemed top-level management, unlike

most employees, to be capable of protecting their own pension expectations."  Gallione v.

Flaherty, 70 F.3d 724, 727 (2d Cir. 1995).  Under the provisions of ERISA, a top hat plan is

unfunded, and "is maintained by an employer primarily for the purpose of providing deferred

compensation for a select group of management or highly compensated individuals."  29 U.S.C.

§ 1051(2).  Because top hat plans are exempt from the fiduciary duties provided for in ERISA,

Paneccasio cannot, as a matter of law, assert his breach of fiduciary duty claim under the statute.

See, e.g., Demery v. Extebank Deferred Compensation Plan (B), 216 F.3d 283, 290 (2d Cir.

2000) ("[A]s the fiduciary responsibility provisions of ERISA do not apply to top hat plans . . . to

the extent that plaintiffs' claim for breach of fiduciary duty was based upon ERISA, the district

court correctly dismissed it.").

Finally, § 502(a)(3) allows a participant to bring a civil action "(A) to enjoin any act or

practice which violates any provision of this title or the terms of the plan, or (B) to obtain other

appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this

title or the terms of the plan." 29 U.S.C. § 1132(a)(3).  The Supreme Court has construed this

statute to provide remedies that would have been available in equity, not those available at law.

Mertens, 508 U.S. at 258-60; see also Great-West Life & Annuity Ins.Co. v. Knudson, 534 U.S.

204 (2002)(upholding the rule in Mertens, and applying it to the distinction between equitable

restitution and legal restitution, holding in that case that the plaintiffs sought legal restitution that

was barred by the statute).  In this case, Paneccasio seeks money damages and attorney's fees.

"Money damages are, of course, the classic form of *legal* relief." Mertens, 508 U.S. at 255

(emphasis in original).  Because Paneccasio seeks only legal remedies, not equitable remedies,

his claim cannot be brought under § 502(a)(3).

Paneccasio, therefore, does not assert a claim under the civil enforcement provisions of

ERISA as to the Unisource Defendants.[14]


**B.      ERISA Claim as to the IKON Defendants**

The IKON Defendants assert three arguments as to Paneccasio's ERISA claim.  First,

they argue that termination of the Plan and payment of the termination benefit was neither

arbitrary nor capricious.  Second, they argue that notwithstanding the lawfulness of the

termination of the Plan, Paneccasio received what he was entitled to under the ERP.  Finally, the

IKON Defendants argue that Paneccasio cannot assert a breach of fiduciary duty claim against

them.

As to the IKON Defendants' argument that payment of the termination benefit to

Paneccasio was neither arbitrary nor capricious, there is no genuine issue of material fact that the

---

[14]Thus, the Court will not address here the Unisource Defendants' argument that even if
Paneccasio could have sued under ERISA, there was no violation.  It is addressed in the
following section as to the IKON Defendants.

IKON Board of Directors acted properly within its discretion to terminate the plan and pay termination benefits accordingly.[15]  As a preliminary matter, the Second Circuit has stated that, "Under ERISA, a district court reviews a plan administrator's discretionary decision under an arbitrary and capricious standard and all other administrator decisions de novo.  The question of which standard of review the district court should apply turns on whether the plan instrument vests the plan administrator with discretion . . . ."  Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 105 (2d Cir. 2005).  The undisputed language of the Plan indicates that the IKON Board of Directors has the discretion to terminate the Plan "at any time it determines that proposed or pending tax law changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact on Alco."  Because the plain language of the Plan indicates that the Board has discretion to terminate the Plan, the arbitrary and capricious standard is the appropriate standard of review for the Court to apply.

The IKON Defendants have presented evidence that the Plan was terminated because of declining interest rates, greater cash outlays related to the lower interest rates for the Split Dollar Policies, and a reduction in the number of participants in the plan, all of which had an adverse financial impact on IKON.   Paneccasio argues that the Plan was terminated for arbitrary and capricious purposes, specifically, that "IKON engaged in false and misleading practices aimed at deceiving the public and violating securities laws."  However, he has presented no evidence of a connection between the termination of the Plan and the securities violation claims (or their settlement).  Thus, Paneccasio has not provided a sufficient factual basis to raise a genuine issue

---

[15]The IKON Defendants do not dispute that they include an appropriate defendant under ERISA § 502(a)(1) for recovery of benefits.

of material fact that the Plan was not lawfully terminated, or that the payment of his termination benefit was arbitrary or capricious.[16]

As to the IKON Defendants' second argument, there is no genuine issue of material fact that Paneccasio received what he was entitled to under the ERP. According to the undisputed language of the Plan, "vesting" affects the benefits a participant will receive under certain circumstances, including reaching age 65. By providing vesting at 65% to Paneccasio, the ERP allowed Paneccasio to retire early without losing his future benefits under the Plan. Had the Plan not been terminated, he would have been able to collect 65% of the benefits once he reached age 65. The ERP, therefore, did not change the language of the Plan, nor did it affect the amount of the termination benefit Paneccasio would be owed if and when the IKON Board exercised its discretion to terminate the Plan.

Finally, the IKON Defendants argue that Paneccasio cannot assert a claim for breach of fiduciary duty against them. As was discussed above in the context of the arguments asserted by the Unisource Defendants, because the Plan was a top hat plan, it is exempt from ERISA's provisions for fiduciary responsibility. Paneccasio does not assert an argument for breach of fiduciary duty that is based on law other than ERISA. He, therefore, cannot, as a matter of law, assert a claim for breach of fiduciary duty against the IKON Defendants.

---

[16]The termination of the Plan was also challenged in Holcomb v. IKON Office Solutions, No. 2:03-cv-106 (D. VT. filed Sept. 13, 2004). In that case, the District Court granted summary judgment in favor of IKON, ruling that "[A] change in the interest rate, even though common, is an occurrence, not merely a continuation of the status quo. As such, IKON's decision to terminate the Plan was permitted by its plain terms." Id. at 15. For a fuller discussion of Paneccasio's claim concerning the reasons for termination of the Plan, see n.12, supra.

### C.    Equitable Estoppel

Turning to Paneccasio's equitable estoppel claim, which all defendants contest, the Second Circuit has recognized that in "'extraordinary circumstances' principles of estoppel can apply to ERISA cases." Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993). "[T]he "extraordinary circumstances" necessary to equitable estoppel in the context of an ERISA plan require conduct tantamount to fraud." Greifenberger v. Hartford Life Ins. Co., 131 Fed. Appx. 756, 759 (2d Cir. 2005). Additionally, to establish an estoppel claim under ERISA the plaintiff must prove the following elements: "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." Aramony v. United Way, 191 F.3d 140, 151 (1999), citing Schonolz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 79 (2d Cir. 1996).

Both the Unisource and IKON Defendants argue that the circumstances in this case are not "extraordinary" and that Paneccasio has not raised a genuine issue of material fact as to the estoppel elements. Indeed, the Unisource and IKON Defendants contend that there is no evidence to support Paneccasio's claim that they should be estopped from denying liability. They argue that neither the Plan nor the ERP asserted that Paneccasio would absolutely receive monthly benefits after he turned 65, regardless of whether the Plan still existed. They argue that because there was no promise or misrepresentation, there could not be detrimental reliance. As discussed in the portion of this opinion about the tolling of the EEOC filing period, these defendants are correct that Paneccasio has not presented evidence of promises or misrepresentations at the time of the ERP – or later – that contradict the Plan provisions, including the termination option.

Paneccasio also argues that "'extraordinary circumstances' requires a 'remarkable consideration such as the use of a promise of benefits to induce certain behavior on the employee's part.'" (Paneccasio's Brief at 23, citing Aramony, 191 F.3rd at 152).  Under this standard, Paneccasio contends that he was induced to retire in reliance on the promise of benefits contained in the ERP, and therefore that there are extraordinary circumstances in this case.  As the Second Circuit noted, "reliance is one of the four basic elements of promissory estoppel, and would not by itself render this case 'extraordinary.'" Devlin v. Transportation Communications International Union, 173 F.3d 94, 102 (1999).  Paneccasio does not provide any factual support that raises a genuine issue of material fact as to a promise of benefits which would override the termination provision of the Plan or that extraordinary circumstances are present.  Because Paneccasio has not raised a genuine issue of material fact as to misrepresentation of the elements of estoppel or extraordinary circumstances, summary judgment is granted for all defendants on his estoppel claim.

## V.      Conclusion

The defendants' motions for summary judgment **[Doc. # 50 ] and [Doc. # 53 ]** are **GRANTED**, and judgment is entered for the defendants.  The clerk is ordered to close this case.

SO ORDERED this   26th   day of July, 2006, at Hartford, Connecticut.


_/s/ CFD_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**